Richard Lee GRAHAM, Appellant,

v.

The STATE of Texas, Appellee.

No. 53462.

Court of Criminal Appeals of Texas,
En Banc.

May 10, 1978.

Rehearing En Banc Denied June 7, 1978.

Chappell & McFall, John Mann, Lubbock, for appellant.

Alton R. Griffin, Dist. Atty. and G. Thomas Cannon, Asst. Dist. Atty., Lubbock, for the State.

## OPINION

ODOM, Judge.

This is an appeal from a conviction for aggravated rape. The jury assessed punishment at sixty years.

The offense was committed on September 2, 1974. On December 2 appellant was found incompetent to stand trial. Another jury found him competent to stand trial on September 8, 1975. At trial appellant plead not guilty by reason of insanity, and the jury found him sane at the time of the offense and guilty on September 16.

On appeal he contends, (1) the jury's verdict finding him sane at the time of the offense was against the overwhelming weight and preponderance of the testimony, (2) the trial court erroneously refused to allow him to inform the jury during the selection process of the civil alternative to the criminal sanction, (3) the jury instruction on the insanity issue was improper, and (4) the prosecutor made improper, prejudicial jury argument.

Appellant's first ground of error asserts that the jury's verdict on his insanity defense was against the overwhelming weight and preponderance of the evidence. He relies on *Kiernan v. State*, 84 Tex.Cr.R. 500, 208 S.W. 518, and *Gardner v. State*, 85 Tex.Cr.R. 103, 210 S.W. 694.

The offense was committed on September 2, 1974. Thus, V.T.C.A., Penal Code Sec. 8.01 was in effect and provides the standard for this issue. Sec. 8.01 provides:

"(a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of mental disease or defect, either did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated.

"(b) The term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

Since this issue is identified as an affirmative defense, the accused must carry the burden of proof by a preponderance of the evidence. V.T.C.A., Penal Code Sec. 2.04(d). Other procedural matters relating to the issue are provided in Art. 46.03, V.A. C.C.P.

At the guilt stage of the trial three witnesses testified for the State, and the defense presented the testimony of two psychiatrists. The State called the victim (G‗‗‗‗‗‗), the investigating officer who saw the victim shortly after the crime, and the physician who examined her. The defense witnesses were the only witnesses to give expert testimony on the insanity issue. Consequently, appellant argues there was "uncontroverted and undisputed testimony from expert witnesses as to Appellant's insanity at the time of the commission of the offense. . . ." and there was "no evidence to rebut the defense's testimony regarding the insanity of the Appellant at the time the crime took place. . . ." The State, in reply, relies on the victim's testimony regarding appellant's behavior and statements on the night of the offense, and suggests there are conflicts within and between the experts' testimony. To consider this issue it is necessary first to summarize the testimony of G‗‗‗‗‗‗ (the victim) and of doctors Raines and Weddige (the psychiatrists).

## TESTIMONY OF THE VICTIM

G‗‗‗‗‗‗ testified that on September 2, 1974, at about 8:30 p. m., appellant came by her house and invited her to go get some beer with him. She was previously acquainted with appellant through mutual friends. On the way toward Buffalo Lake they stopped at a liquor store. After appellant bought a six pack of beer, they drove toward Slaton. Appellant was drinking but

G_____ did not drink much. About twenty minutes from leaving G_____'s house, appellant stopped the car on the road and got out "to use the bathroom." When he got back in the car he tried to kiss G_____ who told him she did not want to, and told appellant to take her home. He refused and she said she would walk home, and started walking down the road. Appellant then yelled for her to get back in the car and he would take her home.

Appellant started driving back to Lubbock, then turned off on a narrow dirt road. It was dark and he was still drinking. He stopped the car again and went around to G_____'s side of the car and tried to kiss her again. When she refused, he jerked her from the car, threw her to the ground, and ripped her blouse open. G_____ testified appellant kept saying he wanted her and she said she did not want to. Appellant hit her several times and hit her in the left eye with his fist. G_____ testified, "Then after he hit me and all, I guess he come back to his senses or something and then he got out there and he helped me up and he started apologizing, and he said did I do that, I didn't mean to do that, and stuff like that." She asked appellant to take her home, but he was afraid to. She assured him it would be all right, and said they should go to the store to get gauze, tape, and ice to bring the swelling down. Appellant expressed fear that her parents were at her house and that she would go to the police. She told him she would say some girls ganged up on her and beat her up. They got in the car and started toward Lubbock.

Appellant stopped the car at a store and bought gauze, tape, ice, and two six packs of beer. He next drove to his house where he went inside for ten to twenty minutes. They then continued toward Lubbock. Appellant again turned the car off on a dirt road and in reply to G_____'s question said they were going to see a friend. He next stopped the car on a dirt road, put a sharp object to G_____'s throat, and tied her hands behind her back with the tape he had bought at the store. He then drove to a drainage tunnel near 42nd and A, removed the cover, and ordered G_____ to enter. There was no light in the tunnel, but appellant had brought a flashlight. He told her he had many places he could hide her, that no one would find her, and that he did not know whether he was going to kill her or not. G_____ was scared and figured he would do anything. He told her she could scream all she wanted and no one could hear her. Then he untied her hands and told her he would see how fast she could get her clothes off or he would kill her. After she undressed, he tied her hands back together.

G_____ recounted the sexual assaults that followed. "Then he started making me have oral sex with him and call him master and how much I liked it and how much I enjoyed it." She complied because she could not avoid it. There followed acts of sexual intercourse with G_____ forced to lie on the cement with her hands tied behind her back. Appellant accomplished three acts of vaginal intercourse and three acts of anal intercourse. He then tied her hands up over her to a pipe with her belt. As he started to leave her there he told her not to yell, "[B]ecause if I did he would kill me and if he didn't his partner would and his partner was death. . . ." After leaving briefly appellant returned and said he would see how loud she could scream. He whipped her on the back and legs with her belt. G_____ testified that after the whipping, "Well, then I guess he got his senses back or something and he let me down and he started looking at me and he asked me if he had done that and I said yeah. And he said, well, I'm sorry. I guess I have been drinking too much and all, so then he untied my hands and told me to get my clothes on." After she dressed he helped her out of the tunnel and they went to the car. When she realized her purse had been forgotten they returned to the tunnel where he looked for it without success.

Appellant feared taking her home and she convinced him she would tell her parents that some girls had ganged up on her,

and that she would not go to the police. He let her out of the car one block from her home. She walked up to her house around 2:00 a.m. and found her boyfriend and other friends waiting for her.

On cross-examination of the victim the following information was elicited:

"Q. Did he act like he was out of his senses and crazy at that time when he was beating you up?

"A. No. He acted like he was—I don't know. He just went crazy doing it. He just hit me and all at once and telling me to shut up and all.

"Q. Just acted like he was in a frenzy and crazy. Is that right?

"A. Yes.

"Q. And he was apologizing to you and he said, 'Did I do that?' Is that right?

"A. Yes.

"Q. Did he act like that he didn't realize that he had done it?

"A. Well, for a minute he did. He kept asking, he goes did I do that. I'm sorry for that, and like that.

"Q. And he was really apologetic. Is that right, or he seemed to be?

"A. Yeah, he seemed to be.

"Q. And then he said he didn't mean to do it. Is that right?

"A. Yes.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Then after he got through whipping you what did he do.

"A. Then he let me down and started asking me if he had done that and that he was sorry for it and all, that he had probably had too much to drink, and then he told me that he had been taking some little white pills all day too.

"Q. Did he tell you that he had been to the hospital at any time this evening?

"A. No.

"Q. Did he at any time while he was abusing you have a hysterical laugh?

"A. No.

"Q. You don't recall that?

"A. No, I don't.

"Q. Do you recall him doing any mumbling or anything of that nature to himself?

"A. No.

"Q. But after he came back and whipped you he helped you get your hands down. Is that right?

"A. Yeah. He got my hands down and then he started untying me and then he asked me if he had done that and all, and then he said he was sorry and that he would take me home and all, but he was afraid to.

"Q. He started apologizing and said did I do that. Is that what he said?

"A. Yes.

"Q. And did he act like he didn't know that he had done that, did he act that way?

"A. I think he knew that he had done it. He was just saying that.

"Q. But he did say did I do that?

"A. Yes, he did.

"Q. And he had said that before when he threw you down on the ground?

"A. Yes."

On redirect examination the witness further testified on appellant's apologetic statements:

"Q. After every time that he would either hit you or do something along this line he would then apologize. Is that correct?

"A. Yeah, the two times that he did, when he blacked my eye and then when he beat me up in the tunnel, then he started asking me if he did it, and then he would say he was sorry for it.

"Q. Did he ever apologize to you for having sexual intercourse with you?

"A. No, he didn't.

"Q. And you say that you had the feeling that he knew what he had done, but he just said that. Is that right?

"A. I think he knew what he was doing. He was just saying that to make me feel better toward him or something."

## TESTIMONY OF THE DOCTORS

Two psychiatrists who had observed appellant and prescribed medication for him from as early as December of 1972 testified for the defense. Their testimony covered several subjects: (1) the symptoms of a schizophrenic condition, (2) information obtained from interviews with appellant, symptoms exhibited by him, and diagnosis of his condition (a) before commission of the offense, from December 1972 until February 1974, their last contact with appellant prior to the offense, (b) after the offense in September 1974 until his commitment after he was found incompetent to stand trial in December 1974 and (c) after recertification for a determination of competency in mid-1975, and (3) their expert opinion regarding appellant's condition at the commission of the offense on September 2, 1974.

Dr. Raines testified that a schizophrenic condition is characterized by confusion, perplexity, disorientation as to person, place and time, and by periods when the person is a complete blank mentally and cannot answer a question. Many experience hostility, fear or anger with an inability to explain or to give a reason for such feelings. As the condition progresses it has a tendency to be chronic, and is characterized eventually by mental deterioration. When asked to explain the use of "chronic" to characterize schizophrenia, the doctor stated that tests of persons who suffer a severe psychotic break of schizophrenia, given before and after the break, indicate they "lose a little bit each time, so we don't think really that people get well of schizophrenia, but it is characterized by remissions where they seem fairly normal, but on real close observation we can usually see some schizophrenia characteristics about these patients." The ability of a person with a schizophrenic condition to conform his conduct to the law depends on "the degree of his sickness," according to the doctor. "People can be a little bit schizophrenic and be in complete control of their facilities [sic], but if they are severely ill, certainly if they are psychotic they are unable to conform their

behavior to within the limits of the law or to know the difference between right and wrong even." Many schizophrenic persons are able to conform their behavior to the law, and there are times when they are aware of what they are doing. Regarding schizophrenic, paranoid type, Dr. Raines testified that paranoia is characterized by delusions of persecution, excessive suspiciousness, mistrust, and feelings such as of being watched, spied on, plotted against and so forth. Remissions are common and can occur dramatically, but more characteristic is a slow increase in anxiety with behavior becoming more bizarre, until relatives finally decide some help is needed. The doctor also testified, " . . . people in a fugue state of not knowing what they are doing quite often carry on a conversation with you, they can drive a car, they can do all sorts of things, but you ask them about it the next day and they have no memory of it." Schizophrenic persons also often have difficulty distinguishing fantasy and dreams from reality.

Dr. Weddige, the other psychiatrist-witness in this case, described schizophrenia as a psychosis where someone cannot tell the difference between what is real and what is not real. In many cases heredity appears to play a role. Experience of hallucinations is one symptom. "Chronic" means it goes on for a long period of time during which there may be flare-ups in symptoms, or very disorganized thinking, and at other times there may appear a quite normal ability to think. Recurrences may be for varying lengths of time, and the duration cannot be predicted. Remissions and recurrences can change from hour to hour "or maybe even quicker." During remission one can know what he is doing, know that it is wrong, and can conform to the law.

A composite review of the testimony of both psychiatrists reveals the following sequence of interviews with appellant:

| Dec. 7, 1972 | Dr. Raines first saw appellant |
|---|---|
| August 1973 | seen by both doctors, diagnosed schizophrenic, chronic undifferentiated type |

| | |
|---|---|
| October 1973 | Dr. Weddige found appellant better at the visit, although he had been hospitalized for further deterioration in symptoms |
| February 1974 | Dr. Weddige found appellant's symptoms in remission |
| (Sept. 2, 1974 | date of offense) |
| Sept. 20, 1974 | Dr. Raines found paranoid ideation |
| October 1974 | appellant was hospitalized and then discharged; diagnosis by Dr. Raines of schizophrenic, paranoid type |
| Oct. 27, 1974 | appellant took thorazine overdose and was admitted at emergency room |
| Oct. 31, 1974 | readmitted to hospital as still suicidal |
| (Dec. 2, 1974 | Dr. Raines testified at competency hearing and appellant found not competent to stand trial) |
| July 22, 1975 | Dr. Raines found appellant's condition in remission |
| (Sept. 8, 1975 | jury found appellant competent to stand trial) |

Appellant's history and symptoms prior to the commission of the offense, as disclosed through interviews with appellant, according to the testimony, included many physical complaints for which no physical cause could be found. From this appellant was first referred as a likely psychiatric case. The doctors noted a history of mental illness in appellant's family, most strongly in his paternal grandfather. Before the referral he had been to the hospital after taking a bottle of tranquilizers, was severely depressed, and signed himself out of the hospital against medical advice. Several other suicide attempts were referred to. In his August 1973 interview Dr. Weddige saw early signs of schizophrenia. February 1974 was appellant's last visit with the doctors before commission of the offense over six months later, and at that time Dr. Weddige found appellant's condition in remission.

Appellant first saw one of the doctors after the offense on September 20, 1974. At that time Dr. Raines noted appellant had "rather drastic mood swings with paranoid ideation [and] auditory and visual hallucinations. . . ." A little over a month later, appellant called Dr. Raines from a phone booth and said he had taken an overdose of thorazine and asked how much would be enough to kill him. He would not say where he was, but an hour later he showed up at the hospital emergency room. The doctor's report, read into evidence, recites that appellant thought the rape was a nightmare and that he was asleep and dreaming while it was happening. Appellant reported feeling he would never be any better and he would rather be dead. On October 31 he was readmitted to the hospital and still considered suicidal. He reported feeling hopeless, miserable, and would rather be dead. About a month later he was found incompetent to stand trial.

After appellant was certified for a second determination of his competency to stand trial, and before that competency hearing was held, Dr. Raines again saw appellant and reported his observations in a letter to the court that was read into evidence. He found appellant "seemed to be completely all right," and although he still had schizophrenia, it was in remission. He also reported, "When most recently examined on July 22, 1975, about the only sign or symptom of mental illness that he has was manifested in the fact that he had learned quite a bit of law since he got into trouble."

We turn now to the expert opinions of appellant's condition on September 2, 1974, the date of the offense. Dr. Raines on direct examination testified to the conclusions that on September 2 appellant was not aware that his conduct was wrong and was not capable of conforming his conduct to the law. On cross-examination he was asked the basis for those conclusions, and replied, "Well, I've known Richard for some time and he is a kind human being. I cannot believe that Richard Graham in his right mind could harm anyone," and, "Knowing that he had a mental illness that is characterized by periods when they don't

know what they are doing, what is right and wrong." He also conceded on cross-examination that it was possible that on September 2 appellant's condition was in remission and that he was aware that his conduct was wrong and was capable of conforming his actions.

Dr. Weddige testified that appellant on the date in question "because of his chronic disorder . . . would have difficulty conforming his conduct to the letter of the law," yet on cross-examination he, too, admitted the possibility of remission.

### THE INSANITY DEFENSE ISSUE

The insanity defense in this jurisdiction is stated by statute in Sec. 8.01, supra:

"It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of mental disease or defect, either did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated."

The practice commentary to this provision is helpful in understanding the defense. It provides in part:

"The mental responsibility decision admittedly is an undifferentiated blend of medical, legal, and social considerations. However, it is the law and its processes that are entrusted with the obligation to reflect the existing state of medical and psychological knowledge and social norms. The legal policy involved is capable of being stated in many ways—and in many words—but at bottom it appears to be a policy against the imposition of criminal sanctions on those persons who, because of mental disease or defect, are unable to regulate and control their behavior in accordance with legal norms. The articulations of this legal policy, and the accommodation of the existing state of medical and psychological knowledge as well as social norms, is the task of a rule of mental responsibility for crime, i. e., insanity.

"Section 8.01 identifies the disorder, mental disease or defect, and then requires the trier of facts to determine if the disorder is present and whether as a result the person did not know his conduct was wrong or could not conform his conduct to the requirements of the law. This test permits the expert to testify in terms of the 'whole man' and focuses squarely and honestly on the appropriate legal policy."

The purpose of the insanity defense issue is to determine whether the accused should be held responsible for the crime, or whether his mental condition will excuse holding him responsible. The Legislature has adopted the ALI Model Penal Code test for criminal responsibility in a modified form. The elements of the defense that describe the appropriate considerations for the jury in determining the responsibility issue are:

(1) The accused at the time of the conduct charged,

(2) as a result of mental disease or defect

(3)(a) did not know his conduct was wrong, or

(b) was incapable of conforming his conduct to the requirements of the law he allegedly violated.

While the defense is expressed in terms of a "mental disease or defect," the issue is not strictly a medical one. It is an issue that invokes ethical and legal considerations as well. This basic character of the defense has been recognized in prior decisions. We will refer to a few cases for illustration.

In *McGee v. State*, 155 Tex.Cr.R. 639, 238 S.W.2d 707, the sufficiency of the evidence on the insanity defense was challenged. Omitting the facts, we excerpt from the opinion in that case:

"It is sufficient to say that it is difficult to understand how a stronger defense of insanity could be developed in the trial of a criminal case. We say this in view, especially, of the fact that the medical and expert witnesses all agreed

that the appellant was suffering from some abnormal mental condition or dementia. Prominent psychiatrists attested the fact that such condition rendered the appellant incapable of knowing right from wrong or the nature and extent of his acts. On the other hand, Dr. Baugh, testifying in behalf of the state and after conceding that appellant was, from a medical standpoint, insane, testified as follows: 'I simply say that he still had mind enough to know the right and wrong of his act on July 7 and to know the nature and consequences of his acts.'

"This statement by the witness, in connection with his other testimony, very clearly draws the distinction between medical and legal insanity. From a medical standpoint, one may be insane by reason of mental disease or mania, yet, from a legal aspect, not unless or until his mental condition has reached the point where he is unable to distinguish right from wrong and to know the nature and consequences of his act is he exonerated or excused for crime committed while in that condition." [1]

In *Ross v. State,* 153 Tex.Cr.R. 312, 220 S.W.2d 137, 139, 144, the following observations were made on the scope of the insanity defense:

"Eliminating all discussion about the types of insanity, the one controlling question in this case is whether the accused was so mentally deranged at the time of the commission of the alleged offense as to [meet the test used at that time]. He might have been indulged even from childhood so that he gave undue importance to his own position in matters. He might have been sensitive, suspicious, and retiring. He might have been abnormal, as concluded by the psychiatrists, all the days of his life. His nerves might have been frayed because of his strenuous professional duties and the worr[ies] which his losses brought upon him. Yet the question remains: Did he have sufficient mental capacity at the time of the tragedy to [meet the test used at that time.]

"The circumstances under which the murder took place are important. His actions before and after the tragedy were considered by the jury. His life experiences were presented to the jury and utilized by them in determining the mental capacity of the man at the very time of the shooting. The field of inquiry is wide, but this cannot affect the rule of law which we have stated . . ..

\* \* \* \* \* \*

"Mere mental deficiency or derangement, though it may constitute a form of insanity known to and recognized by medical science, does not excuse one for crime."

The issue is not strictly medical, and expert witnesses, although capable of giving testimony that may aid the jury in its determination of the ultimate issue, are not capable of dictating determination of that issue. Only the jury can join the non-medical components that must also be considered in deciding the ultimate issue. That ultimate issue of criminal responsibility is beyond the province of expert witnesses. Were it otherwise, the issue would be tried in hospitals rather than the courts. In *Hefley v. State,* 480 S.W.2d 810 (Tex.Civ.App.), an appeal from a restoration of sanity proceeding, the court wrote:

"The argument of the appellant that he is sane as a matter of law because each of the three psychiatrists called as a witness said that in their opinion he was sane and that no psychiatrist for the State testified that he was insane is untenable. If this were not so a determination of the issue of sanity would be left solely in the hands of psychiatrists and the important function of the jury to make such determination would be vitiated."

These interrelated problems of the role of the expert witness, the role of the jury, and the nature of this issue that involves ethical and legal considerations as well as the

1. The test for the insanity defense is now governed by the statutory language set out above.

medical consideration, have been the subject of much discussion and opinion writing in the United States Court of Appeals for the District of Columbia Circuit. A lengthy discussion of the subject, with the history of the issue in that court, and a summary of the positions of other circuits, may be found in *United States v. Brawner,* 153 U.S.App. D.C. 1, 471 F.2d 969. In that case the court was concerned with domination of the issue by expert witnesses testifying to legal conclusions in terms of the issue. The court adopted a modified form of the ALI Model Penal Code test, just as this jurisdiction has. Although the two variations are not identical, the *Brawner* court's observations on the ultimate issue are relevant to our discussion today:

> "The doctrine of criminal responsibility is such that there can be no doubt 'of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments,' . . . [J]ury decisions have been accorded unusual deference even when they have found responsibility in the face of a powerful record, with medical evidence uncontradicted, pointing toward exculpation. The 'moral' elements of the decision are not defined exclusively by religious considerations but by the totality of underlying conceptions of ethics and justice shared by the community, as expressed by its jury surrogate. The essential feature of a jury 'lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.' . . .
>
> "The expert witnesses—psychiatrists and psychologists—are called to adduce relevant information concerning what may for convenience be referred to as the 'medical' component of the responsibility issue. But the difficulty . . . is that the medical expert comes, by testimony [in terms of the statutory test] to express conclusions that in essence embody ethical and legal conclusions." (153 U.S.App.D.C. at pp. 14–15, 471 F.2d at pp. 982–983)

With this understanding of the complexity of the issue, "intertwining moral, legal, and medical judgments," we turn next to the effect of the evidence summarized above in light of the nature of the issue.

## THE EFFECT OF THE EVIDENCE

The thrust of appellant's argument is that the expert testimony he presented on the issue stood uncontroverted by the State. He also relies on G\_ \_ \_ \_ \_ \_'s testimony that appellant "just went crazy doing it," and her statements describing appellant as "getting his senses back" after the physical violence he inflicted upon her.

■ It is not necessary for the State to present expert medical testimony that a defendant is sane in order to counter the defense experts. In *Hernandez v. State,* 157 Tex.Cr.R. 112, 247 S.W.2d 260, and *Ross v. State,* 153 Tex.Cr.R. 312, 220 S.W.2d 137, 143, jury findings that the accused was sane were upheld even though no medical expert testified to that effect. In *United States v. Fortune,* 513 F.2d 883 (5th Cir. 1975), reh. denied 518 F.2d 1407, cert. denied 423 U.S. 1020, 96 S.Ct. 459, 46 L.Ed.2d 393 (where the government must prove the defendant's sanity beyond a reasonable doubt once the issue is raised), the court wrote:

> "A defendant is not entitled to a judgment of acquittal simply because he offers expert testimony on the issue of insanity and the government attempts to rebut it without any expert witnesses. . . . While a jury may not arbitrarily disregard expert testimony, it also may not give conclusive effect to the opinion of an expert merely because that opinion is not challenged by some other expert."

In *Muro v. Houston Fire & Casualty Ins. Co.,* 329 S.W.2d 326 (San Antonio Civ.App., 1959, ref. n. r. e.), the court wrote:

> "[The jury] may accept or reject in whole or in part the opinion testimony of

physicians. They may accept lay testimony over that of experts. Opinion testimony does not establish material facts as a matter of law. *Hood v. Texas Indemnity Ins. Co.,* 146 Tex. 522, 209 S.W.2d 345; *Fry v. Dixie Motor Coach Corp.,* 142 Tex. 589, 180 S.W.2d 135; *Coxson v. Atlanta Life Ins. Co.,* 142 Tex. 544, 179 S.W.2d 943. 'If the opinions of the experts as given in the evidence do not comport with the jurors' idea of sound logic, the jurors have a right to say so.' *Maryland Casualty Co. v. Hearks,* 144 Tex. 317, 190 S.W.2d 62, 64."

These rules on the weight of expert opinion testimony are especially true on the issue of the insanity defense, in that this issue is more than just a medical one. We look now at the expert testimony in this case.

▮ The mental condition of appellant at the time of the commission of the offense is relevant under the terms of the statutory defense. Cf. *Griffin v. State,* 154 Tex.Cr.R. 295, 226 S.W.2d 869, 870 (on motion for rehearing). The last time either of appellant's expert witnesses saw him before the crime was six months before that event, and at that time his condition was in remission. Although his condition at his next examination eighteen days after the offense, and during the ensuing two or three months, was described in severe terms by the doctors, it is also true that these observations and assessments were made at a time when appellant was charged with a serious offense, and no doubt was under a considerable degree of stress from the proceedings against him. It cannot be said as a matter of law that the diagnosis in late September and October may be projected back to the offense and held conclusive as to that date. Also, as the doctors testified, schizophrenia is characterized by remissions and recurrences that come at irregular and unpredictable intervals.

The doctors' conclusions in terms of the statutory defense (as distinguished from their descriptions of the diagnostic process and results, and other properly medical matters) are of negligible weight in con-

sidering this issue. We reach this conclusion not only on the authorities referred to above, and on the nature of the issue as more than one of medical fact, but also because those conclusions in this case are not shown to rest on anything more than a general deduction from the diagnostic classification of appellant as schizophrenic. In this respect the doctors' testimony regarding variations in the severity of the condition and its effects, both among the population of persons with schizophrenic symptoms, and over time in any individual exhibiting such characteristics, served in the nature of impeachment of their own extreme conclusion of appellant's mental state on the particular date in question.

▮ The circumstances of the crime itself are always important in determining the mental state of the accused at the commission of the offense. *Ross v. State,* 220 S.W.2d 137, 139. Attempts to conceal incriminating evidence and to elude officers can indicate knowledge of wrongful conduct. *Runnels v. State,* 101 Tex.Cr.R. 434, 276 S.W. 289; *Griffin v. State,* 154 Tex. Cr.R. 295, 226 S.W.2d 869, 870 (on motion for rehearing). In *Murray v. State,* 147 Tex.Cr.R. 474, 182 S.W.2d 475, 477, on appeal from a conviction for rape, the importance of the circumstances surrounding the offense was plainly described:

"The facts themselves evidenced an enforced association between the two injured parties and appellant over a period of hours, appellant's greed being evidenced as well as his lust towards the young lady; his fear of detection and effort to escape evidencing his fear of punishment for the deeds committed doubtless had some weight with the jury as to their finding relative to his knowledge of right and wrong, and the consequences of his act. . . . The motive in his actions seems to suggest that of lust for the person of this young girl, and a knowledge of the serious consequences following the gratification of such lust, evidently possessed of a knowledge that he was committing a wrong."

■ While the insanity defense is no longer restricted to lack of knowledge of wrongfulness of the conduct, but may rest alternatively on incapacity to conform conduct to the requirements of the law violated, Sec. 8.01, supra, the circumstances surrounding the offense remain relevant to the jury's determination of the issue. Here, the behavior of appellant during the early part of the evening of September 2, as described in G_____'s testimony, was generally normal and demonstrated an awareness of the situation. As the evening progressed he consumed more and more beer, and made repeated sexual advances with increasing aggressiveness, reaching physical violence on his second unsuccessful attempt, and culminating in forced sexual violence and beatings in his final attack. His apologies after the beatings and his fear of taking G_____ home because of fear of her parents and that she would go the police indicate an awareness of his acts and of wrongfulness. His consumption of alcoholic drink taken with his own statements after his acts that he must have been drinking too much indicates a likely source of his failure to exercise restraint over his own behavior.

G_____'s testimony that during the attack appellant went crazy and that after the attack he got his senses back or came back to his senses need not be taken as evidence of insanity. Such expressions are often used in everyday speech to describe behavior that is unexpected, inappropriate, or bizarre, without implying the sense of insanity that excuses criminal responsibility. The context of the witness' testimony shows she was using "crazy" in the everyday sense.[2] Appellant's reliance on this testimony is misplaced.

■ Ultimately the issue of insanity at the time of the offense excusing criminal responsibility lies in the province of the jury, not only as to the credibility of the witnesses and weight of the evidence, but also as to the limits of the defense itself.[3] This is because, as discussed in the preceding section of this opinion, the issue is not, strictly speaking, one of medical fact. Cf. *Ross v. State, McGee v. State, United States v. Brawner,* all supra. The issue encompasses more than mere facts, requiring a considered judgment of whether the accused as a *result* of mental disease or

2. "Q. Did he act like he was out of his senses and crazy at that time when he was beating you up?

"A. No. He acted like he was—I don't know. He just went crazy doing it. He just hit me and all at once and telling me to shut up and all.

Referring to appellant's queries, "Did I do that?" the victim testified "I think he knew what he was doing. He was just saying that to make me feel better toward him or something."

3. The limits of many defenses are left to the jury. Such limits are usually expressed in terms that leave to the jury the application of norms that are not readily susceptible to reduction to a concise factual formula. The jury in this sense participates in determining the law as well as the facts. Many defenses exhibit this characteristic through incorporation of a standard of "reasonable belief." See, e. g., V.T.C.A, Penal Code Secs. 8.02(a), Mistake of Fact; 8.03(b), Mistake of Law; 9.21(a)(c), Public Duty; 9.22(1), Necessity; 9.31, Self-Defense; 9.32(3), Deadly Force in Defense of Person; 9.33, Defense of Third Person; 9.34, Protection of Life or Health; 9.41, Protection of One's Own Property; 9.42, Deadly Force to Protect Property. Other defenses use other reasonableness standards. See, e. g., Secs. 8.05, Duress (a person of reasonable firmness); 9.03, Confinement as Justifiable Force (takes reasonable measures to terminate); 9.22(2), Necessity (according to ordinary standards of reasonableness); 9.32(2), Deadly Force in Defense of Person (a reasonable person in the actor's situation); 9.44(2), Use of Device to Protect Property (use of the device is reasonable). Sometimes terms other than "reasonable" are used. See, e. g., Secs. 8.06(a), Entrapment (persuasion or other means likely to cause); 42.01(b), Disorderly Conduct (significant provocation). According to the standard and the scope of the issue, the degree of discretion accorded the jury in resolving the issue on undisputed facts will vary. Before such a decision may be overturned on appeal, the fact issue must be undisputed or resolved to one end of the spectrum, *and* that fact determination must be found to lie outside the realm of discretion accorded the jury under the applicable standard, be it "reasonable belief," "reasonable firmness," "likely to cause," or some other.

defect did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated. The "mental disease or defect" component is one that limits the availability of the defense, not one that automatically invokes its protective shield. In deciding whether the abnormal mental condition of the accused will excuse criminal responsibility, the jury is not restricted to medical science theories of causation. The connective "result" requirement of the issue encompasses the inarticulable ethical component, which includes imperatives of free will, self control, and responsibility for one's acts that are fundamental to our notions of man, and that are the foundation of social relations and criminal responsibility built on such a concept of man. Rarely will this Court overturn a jury's findings on this issue. *Kiernan v. State,* 85 Tex.Cr.R. 500, 208 S.W. 518 (1919), and *Gardner v. State,* 85 Tex.Cr.R. 103, 210 S.W. 694 (1919), cited by appellant were two such cases. This is not such a case.

The first ground of error is overruled.

In his second ground of error appellant asserts the trial court erroneously restricted defense counsel's voir dire of the jury panel. On appeal he contends he was not allowed to explain to the panel the procedures under Art. 46.03, Sec. 4, V.A.C.C.P., governing disposition of a defendant who is found not guilty by reason of insanity. This, he asserts, denied him the opportunity to empanel a jury free of bias.

The right to ask questions of panel members is included in the right to counsel and is of constitutional magnitude in this State. *Abron v. State,* 523 S.W.2d 405, and authorities cited there. The right, however, is not without limits. In *Abron,* supra, the Court wrote:

"Not every restriction of the conduct of the jury voir dire infringes upon a defendant's right to effective assistance of counsel. This Court has consistently held that the trial court has wide discretion over the course of the voir dire of the jury panel. (1) Reasonable time limits may be placed on the voir dire examination. (2) Repetitious or vexatious questioning may be prevented. (3) Questions asked in an improper form may be disallowed. And (4) the court may restrict inquiry into the personal habits of jurors as opposed to inquiry into personal prejudices or moral beliefs. Furthermore, prejudice or injury must be shown to demonstrate reversible error where the right to propound questions on jury voir dire is restricted." (Citations and footnotes omitted.)

The record in this case reflects the following exchange:

"[Defense counsel addressing panel member]: You also understand that there is a provision in the event that was done where this Court—

"[Prosecutor]: I object to this, Your Honor. He is going into matters which will not even face this jury. They are to decide this case on its facts and not be concerned at all by what may happen in the future.

"THE COURT: Mr. Chappel.

"MR. CHAPPEL: Yes, sir.

"THE COURT: The Court is going to sustain that objection, confine your remarks to the trial of this matter."

Although it is not necessary to show the *answer* that would be given in order to preserve error if a question for exercising peremptory challenges is disallowed, *Burkett v. State,* 516 S.W.2d 147, the *question* should certainly appear in the record. Here, counsel did not even complete the statement that apparently was intended as a predicate for some question. Without more in the record we are unable to say the trial court's ruling was an abuse of discretion. The ground of error is overruled.

Appellant next argues the jury charge on the defense of insanity presents fundamental error by placing the burden of proof on appellant.

By designating the issue an affirmative defense, Sec. 8.01, supra, the Penal Code

places the burden of proof on the accused. Sec. 2.04(d), supra.

The thrust of appellant's argument, however, is that evidence of his prior adjudication of incompetency to stand trial shifted the burden to the State.

■ The defense of insanity at the time of the offense, Sec. 8.01, supra, and the test for incompetency to stand trial, Art. 46.02, Sec. 1, V.A.C.C.P, are wholly distinct issues with no common elements. Furthermore, to the extent that both issues are concerned with the mental status of the person, they are concerned with that status at different times. An adjudication that a person does not have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," or that he does not have "a rational as well as factual understanding of the proceedings against him," Art. 46.02, Sec. 1, supra, does not alter the otherwise existing presumption that at the time of the offense the accused was sane under the standards of Sec. 8.01, supra.

The burden of proof did not shift.[4] The ground of error is overruled.

■ In his final ground of error appellant complains of prosecutorial jury argument. After counsel objected the court instructed the prosecutor to confine his remarks to the record. No adverse ruling was obtained. Nothing is presented for review.

The judgment is affirmed.

4. Furthermore, the adjudication of incompetence to stand trial did not bar appellant's trial because he was subsequently, prior to trial, found competent to stand trial by another jury. *Hare v. State*, Tex.Cr.App., 460 S.W.2d 124, 127–128.