COURT OF APPEALS









COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

 


 
 
  
 LORENZO REYNA,
  
                             Appellant,
  
 v.
  
 THE STATE OF
 TEXAS,
  
                             Appellee.
 
 
  
 '
    
 '
    
 '
    
 '
    
 '
    
  ' 
  
 
 
  
  
                 No. 08-02-00233-CR
  
 Appeal from the
  
 243rd District Court
  
 of El Paso County, Texas 
  
 (TC# 20010D01073)
  
 
 


O P I N I O N

 

Lorenzo Reyna appeals his convictions
for aggravated assault and deadly conduct, following a jury trial.  Finding that the jury=s guilty verdict was against the
great weight and preponderance of the evidence supporting Reyna=s insanity defense, we reverse and
remand.

Facts








On February 7, 2001, Lorenzo Reyna
took a .22 caliber rifle from a trunk in his mother=s and stepfather=s house in Clint, Texas, walked
several miles to mile marker 42 on Interstate 10, and started shooting at cars
as they drove along the highway.  He hit
one motorist, who called 911 and alerted the police.  When the police arrived, they found the rifle
on the ground and Reyna wandering in the desert nearby.  He did not resist arrest or flee.

The police who investigated the
shooting scene found prints from cowboy boots running up and down an embankment
under an overpass.  Reyna was wearing
cowboy boots when the police found him. 
A number of shell casings were near the highway, along with the
rifle.  Some of the shell casings were at
the embankment, others were found leading to where the
rifle was found.

Very early that morning, Reyna
arrived at the house of his mother and stepfather.  He had just returned to the United States
after deportation.  That day he helped
his stepfather move furniture around the house and paint
the kitchen.  According to the
stepfather, Reyna actually helped place the paint in a container, but then just
sat and started talking to himself and laughing.  After taking a bath, his family invited him
to go to church, but he said that he would go later.  His mother testified that on that day, AI didn=t see him mad or upset.  I just saw that he was very thoughtful,
thinking.  But for me this was not new
because I would always see him talking to himself, laughing by himself.@








The evidence shows this is a common
state for Reyna.  His sister explained
that when she sees Reyna, AHe usually talks to somebody. 
He talks to somebody.  We don=t see nobody, but we think that maybe
it=s some mental problem.  He talks to somebody.  He acts like a child, like a kid.  He writes letters.  He writes letters.  Sometimes we don=t understand what he=s trying to tell us or explain to
us.  He=s sometimes very weird.@ 
Although she had not seen Reyna on the day of the shooting, she
testified that she and other family members have observed this type of activity
over the last four or five years.  She
clarified that Reyna was not just talking to himself, but rather Ahe=s talking to somebody, that he=s looking and that he=s seeing somebody, but there is
nobody there.@ 
Reyna=s mother thought of taking him to see
a doctor for this behavior, but she never had the means to do it.

The police were not able to take
Reyna=s statement after his arrest because
he was incoherent.  Detective Onesimo Esparza testified that Reyna was talkative,
he just was not answering questions.  AHe knew where he was at.  He knew he was under arrest.  He knew he was at the patrol station, but the
questions that we asked him, he wouldn=t answer them.@ 
Detective Esparza gave an example: 
A[W]e asked him a question about the
particular case that we were investigating, and he=d come up with something else, that
he was working for Amado Carrillo and that he was a
hit man for Amado Carrillo, things that we weren=t asking him for.@ 
Because of this, the detectives thought that Reyna was incoherent and
could not make a statement.  Reyna did
tell the officer that he had shot somebody.








Detective Michael Torres confirmed
the testimony of Detective Esparza that Reyna was not coherent and would
respond to questions and then he Awent off in different directions.@ 
No written statement was taken because Detective Torres thought that Ait wouldn=t stand.@ 
He also testified that when he first started to speak with Reyna, Reyna
appeared to be coherent and oriented in time and place.  Reyna=s problems appeared, to him, to
surface five to ten minutes into the interview. 
This, too, appears to be normal for Reyna; his mother testified that
occasionally Awe were talking with him about
something, and then he would talk with us of something totally different, as if
he was not able to understand what we were talking about.@








Dr. Mariam
A. Marvasti[1]
testified that in her opinion, Reyna was competent to stand trial, but at the
time of the shooting he was insane and could not appreciate the wrongfulness of
his acts.  This was based on a number of
competency and sanity examinations, and her treatment of Reyna as the jail
psychiatrist.  She also spoke with the
detectives on the case, interviewed members of the family, and read the police
report from the time of the arrest.  Dr. Marvasti first treated Reyna because the nurses and the
jailer reported that he was not acting normal and was hearing voices.  At that time, shortly after his arrest, he
had a number of delusions including that the Mexican Mafia was after him, that
he was born of Jesus, and that he saw panthers in his cell.  Because of the visions and voices that Reyna
was seeing and hearing, Dr. Marvasti prescribed a
number of medications.  Reyna was placed
on Haldol for the hallucinations.  He was also given Benadryl to help him sleep
and Cogentine to alleviate the side effects of the
antipsychotic medicine.

Reyna told the social worker Ana Viera in a February 20 evaluation that he was a cat and
that he had killed Selena and Yolanda Saldivar.  When Dr. Marvasti
first contacted Reyna, he told her that someone owed him a million dollars in
Juarez and a million dollars in El Paso. 
The drug cartel had to pay him for the murder, he said.  He also expressed a desire to kill his
mother.

When asked about his medical history,
Reyna told Dr. Marvasti that he was placed in a
hospital in Colorado because he went to the police there and told them that
agents from the Mexican Mafia were following him and wanted to kill him.  Dr. Marvasti found
no records of any treatment or commitment, however.  Additionally, in 1993 Reyna slashed his
wrists.  At the age of sixteen, he
overdosed on cocaine.

Dr. Marvasti
testified that, at the time of the shooting, Reyna was suffering from a psychosis.  He was delusional, hearing voices, seeing
things and having beliefs that were not real. 
He also suffered from polysubstance abuse,
meaning he had abused several drugs in the past, including alcohol, marijuana,
cocaine, and spray paint.  The drug abuse
over a long term may have led to a psychotic disorder.  From this, Dr. Marvasti
concluded that to a reasonable medical certainty, Reyna was insane at the time
of the shooting and was not aware that what he was doing was wrong.

During cross-examination Dr. Marvasti read from her evaluation the basic structure of
Reyna=s day on February 7:








The
Defendant stated that he was deported to Mexico, but he crossed the border,
came back to El Paso a couple of days later. 
He walked to his mother=s house in Clint. 
He said he got upset with his mother because they did not want him
there.  Then his mother and stepfather
left to the church.  He found a rifle,
which belonged to his stepfather.  He
walked toward the freeway and started shooting because he felt angry with his
stepfather.  He said he had the
intentions to kill people because >I don=t like my mother telling me anything or scolding me
and blaming me for everything.=  At this point
he smiled and said, >I
shot a police car.= 

 

He indicated to Dr. Marvasti that
shooting the police car Awas very inappropriate.@ 
Reyna has a history of acting out in anger.

Dr. Marvasti
described her method of evaluation.  She
explained that she could not rely on Reyna=s self-reporting; rather, she looked
to his actions and the police reports. 
Specifically, Dr. Marvasti asked Detective
Torres about the appearance of drug consumption influencing Reyna=s actions at the time of the
shooting.  There was no indication that
Reyna was under the influence of drugs or alcohol.  She also spoke with Reyna=s parents.








A paper in Reyna=s handwriting was found in the house
listing members of Reyna=s family and others, with various notations including Achinca [sic] tu madre@ and Apagame@--Afuck your mother@ and Apay me.@ 
Dr. Marvasti found the note to be
incoherent.  She mentioned that A[n]ow he
knows that killing is a bad thing,@ placing emphasis on Anow@ being at the time of trial.  At the time of the shooting, she explained,
he was aimlessly shooting at people with whom he was not angry.  Reyna did not resist arrest and just stopped
when the police stopped him.  He told the
officer that Ahe was born of Jesus Christ.  He was powerful.  He could kill.  You know, it didn=t make sense what he did.@ 
Reyna=s stepfather testified that Reyna did
not appear to be angry with either him or the mother.  As the prosecutors gave examples geared to
make Dr. Marvasti admit that persons randomly
shooting or shooting out of anger do not make a person legally insane, they did
not question the specific criteria that Dr. Marvasti
used in making her evaluation.  Her
report on the matter was introduced as the sole exhibit for the defense.

To each count, Reyna pleaded not
guilty.  The jury found him guilty on
both counts, implicitly rejecting the insanity defense, and assessed punishment
at ten years= confinement on the offense of
aggravated assault and five years= confinement on the offense of deadly
conduct.

Great weight of the evidence supports
insanity

Reyna=s sole issue on appeal is that the jury=s rejection of his insanity defense
was against the great weight and preponderance of the evidence.  We agree.

The insanity defense








Insanity is an affirmative
defense.  Tex. Pen. Code Ann. ' 8.01 (Vernon 2003).  The defendant bears both the burden of proof
and the burden of persuasion.  Meraz
v. State, 785 S.W.2d 146, 150 (Tex. Crim. App.
1990).  The purpose of the
insanity defense is to determine whether the accused should be held responsible
for the crime, or whether a mental condition excuses defendant from such
responsibility.  Graham
v. State, 566 S.W.2d 941, 948 (Tex. Crim. App.
1978).  A defendant cannot be
convicted of a criminal offense if legally insane at the time of the crime; the
essential question is whether at the time of the conduct charged, the defendant
as a result of severe mental disease or defect, did not know the conduct was
wrong.  See Tex. Pen. Code Ann. ' 8.01(a).








The issue of insanity is not strictly
medical in nature, but involves legal and ethical considerations as well.  Bigby v. State, 892 S.W.2d 864, 877 (Tex. Crim.
App. 1994); Love v. State, 909 S.W.2d 930, 943 (Tex. App.--El Paso 1995,
pet. ref=d).  An individual may be medically insane, yet
legally retain criminal responsibility for that crime where a mental condition
does not prevent defendant from distinguishing right from wrong.  Graham, 566 S.W.2d
at 948; Love, 909 S.W.2d at 943. 
In determining the issue of legal insanity, the trier
of fact is called upon to join the non-medical components in deciding the
ultimate issue of culpability.  Bigby, 892 S.W.2d at 878.  Expert witnesses, although capable of giving
testimony that may aid the jury in determining the issue, do not dictate the
result.  Graham, 566 S.W.2d at 949. 
However, the jury may not arbitrarily disregard expert testimony.  Id. at 950.  It is not necessary for the State to present
expert medical testimony that a defendant is sane in order to counter the
defense experts= testimony regarding insanity.  Id.; Mitten v.
State, 79 S.W.3d 751, 758-59 (Tex. App.--Corpus Christi 2002, pet.
granted).  The issue of insanity
at the time of the offense lies in the province of the jury not only with
regard to the credibility of the witnesses and the weight of the evidence, but
also as to the limits of the defense itself. 
Graham, 566 S.W.2d at 948; Love,
909 S.W.2d at 943.

Standard of review

In analyzing a claim that a guilty
verdict was against the great weight and preponderance of the evidence
supporting an insanity defense, we consider all evidence relevant to the issue
of insanity in a neutral light to determine whether the finding against the
affirmative defense is so against the great weight and preponderance of the
evidence as to be manifestly unjust.  Bigby, 892 S.W.2d at 875; Meraz, 785 S.W.2d at 155.  Mitten, 79 S.W.3d at 757; Love,
909 S.W.2d at 943; see also Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); but see Dashield
v. State, 110 S.W.3d 111, 116 (Tex. App.--Houston [1st Dist.] 2003, no pet.
h.) (greater deference given to the trial court=s judgment, over vigorous
dissent).  We inquire whether a rational trier of fact could have determined the defendant failed to
prove the defense of insanity by a preponderance of the evidence.  Love, 909 S.W.2d at
943.  Even where the finding of guilt
might be adequately supported if taken alone, it may still be against the great
weight and preponderance of evidence when viewed using the proper
standard.  Bigby,
892 S.W.2d at 875. 
The issue of insanity at the time of the offense lies within the province
of the jury, and we will overturn its decision only where insanity is
undisputed or resolved to one end of the spectrum outside the realm of
discretion.  Bigby,
892 S.W.2d at 878.

Great weight of evidence supports insanity








The record here is replete with
evidence that Reyna did not understand the wrongfulness of his actions at the
time he shot at anonymous motorists on an interstate highway.  His mother, stepfather, and siblings all
testified that he had a history of conversing with hallucinations.  He displayed this delusional behavior on the
day of the shooting.  If he had received
any treatment at all for his mental illness, he was not receiving it at the time
of this shooting.  Detectives found him
near the scene of the shooting, he was not attempting to hide, and the shells
and rifle were left near the highway, with no evidence of any attempt to
conceal them.  After his arrest, officers
were unable to take Reyna=s statement because his responses to questioning were
incoherent.  Dr. Marvasti
treated Reyna, in her capacity as the jail psychiatrist, for auditory and
visual hallucinations, and delusions of being hunted by the Mexican Mafia,
having killed Selena and Yolanda Saldivar, and his
search to kill the killers of Christ and Carlos Fuentes.  Reyna did not know the people he shot, and
apparently did so without motive or any expectation of gain.  These facts, all presented to the jury,
supported Dr. Marvasti=s opinion that at the time of the
shooting, Reyna was insane and incapable of appreciating the wrongfulness of
his actions.

The State=s contentions








The State did not present conflicting
testimony, relying instead on cross-examination to counter the establishment of
a defense of insanity.   We conclude this
was simply inadequate to rebut Reyna=s proof that he was insane when this
incident occurred.  In so deciding, we
distinguish this case from others where courts have found that circumstances
surrounding the crime may controvert lay and medical evidence of insanity.  For example, attempts to conceal
incriminating evidence or to elude officers can indicate the defendant=s knowledge of guilty conduct.  Graham, 566 S.W.2d
at 951.  Defendant=s lucidity before the commission of
the crime, other possible motives for committing the crime, other explanations
for erratic behavior, attempts to eliminate witnesses, and expressions of
regret and fear of the consequences may serve as evidence supporting
guilt.  Torres v.
State, 976 S.W.2d 345, 352 (Tex. App.--Corpus Christi 1998, no pet.).  Any such evidence rebutting insanity is
lacking here.








Moreover, the evidence may be
sufficient to sustain a guilty verdict if it indicates that the defendant
subjectively knew that his acts were wrong. 
Bigby, 892 S.W.2d at 878 (noting that
expert testimony that defendant knew his acts were Aillegal@ by societal standards is enough to
show defendant knew his acts were Awrong@ and sufficient to uphold
conviction); Mitten, 79 S.W.3d at 751, 759 (finding pulling telephone
from wall at crime scene, exculpatory oral statements blaming one of the
victims for the murder of the other, an attempt to avoid leaving fingerprints
on a phone at the police department, and a comment on his jealousy concerning
the victim to be sufficient evidence to show that defendant knew right from
wrong at the time of stabbing); Love, 909 S.W.2d at 930, 943 (finding
that witness testimony of defendant=s lucidity, actions by defendant to
avoid drawing attention to himself as he drove past a police station, and a
potential motive for the crime of trying not to be returned to a medical facility
supported conviction); Plough v. State, 725 S.W.2d 494, 500 (Tex.
App.--Corpus Christi 1987, no pet.) (finding that
although strong evidence of mental illness was presented, attempts to conceal
incriminatory evidence and elude officers revealed a cognizance of wrongful
conduct supporting conviction by jury). 
Conversely, failure to show this ability to distinguish right from
wrong, in the face of strong evidence establishing the affirmative defense of
insanity, will not constitute factually sufficient evidence of guilt.  Morgan v. State, 869 S.W.2d 388, 390
(Tex. App.--Tyler 1993, pet. ref=d) (reversing conviction and
remanding cause where defense expert and lay testimony was found to be more
reliable and convincing than that presented by the State); Olivier v. State,
850 S.W.2d 742, 745 (Tex. App.--Houston [14th Dist.] 1993, pet. ref=d) (reversing conviction and
remanding cause where defense evidence was Alengthy, convincing, and uncontradicted@ by the State with either medical or
lay testimony).  The State here did not
present evidence that could lead a reasonable jury to believe that Reyna could
have known his acts were wrong, and rebutting the evidence supporting the
affirmative defense provided by section 8.01.








The State asserts that there is
sufficient evidence for the jury to have found that Reyna was capable of
determining right from wrong at the time of the offense.  First they point out that he indicated to Dr.
Marvasti that shooting the officer was Avery inappropriate.@ 
Notably, this is from an interview that took place long after the
shooting.  This acknowledgment by Reyna
does not speak of his understanding at the time of the offense.  The State also points to testimony that he
may have acted out of anger and that anger does not make one legally
insane.  Again, this argument misses the
mark.  Insane people can be angry or not;
angry people can be sane or insane.  The
two traits are neither companions of one another nor
are they exclusive of one another. 
Although there may be more of a connection if the victim was the object
of Reyna=s anger, or even connected in some
way to that object, such is not the case here. 
The motorists on Interstate 10 were wholly unconnected in any way to
Reyna or his family.

Through cross-examination, the State
also drew from Dr. Marvasti testimony that
schizophrenics can have moments of lucidity, and delusional people can still
know right from wrong.  Again, these
matters do not undermine the great weight of evidence presented by the defense.  If anything, they show that Dr. Marvasti was aware of the universe of mental illness when
she made her assessment of Reyna=s condition.  The State points out the police were able to
converse with Reyna for a few minutes before his answers became
incoherent.  This however, does not
present any proof of the likelihood that he could distinguish right from wrong
at the time without giving any of the substance of the conversation.  The State here was unable to muster the type
of evidence that the courts relied upon in upholding the guilty verdicts in Bigby, Mitten, Love, or Plough.  Nor was cross-examination an effective attack
on the reliability of testimony and conclusions of Dr. Marvasti
or the family members.








We must conclude the judgment in this
case was overwhelmingly against the great weight and preponderance of evidence
on the threshold question of whether the defendant could distinguish right from
wrong.  No rational jury could decide
from the evidence presented that Reyna was able to appreciate the wrongfulness
of his actions.  Their rejection of this
evidence appears arbitrary to this Court. 
Reyna=s sole point for review is sustained.

Conclusion

For the foregoing reasons, the
judgment of the trial court is reversed and the cause is remanded for a new
trial.

 

SUSAN
LARSEN, Justice

August 28, 2003

 

Before Panel No. 3

Barajas, C.J., Larsen, and
Chew, JJ.

 

(Publish)

 











[1]Dr.
Marvasti originally met with Reyna in her role as a
jail psychiatrist.  Later, she was
appointed to determine his competency to stand trial and his sanity at the time
of the offense by the trial judge.