**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert LYONS, Defendant-Appellant.**

**No. 82–3429.**

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1984.

Julian R. Murray, Jr., New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Patrick J. Fanning, Harry W. McSherry, Jr., Asst. U.S. Attys., New Orleans, La., Sidney Glazer, Joel Gershowitz, Attys., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Donald N. Bersoff, Washington, D.C., for Am. Psychological Assoc.

B. James George, Jr., Joel I. Klein, Am. Psychiatric Assoc., Washington, D.C., Richard P. Lynch, Director, American Bar Association, Washington, D.C., Wallace D. Riley, Chicago, Ill., for American Bar Ass'n.

Frank Maloney, Austin, Tex., for Nat. Assoc. Crim. Defense Lawyers.

(Opinion Rendered April 16, 1984, 731 F.2d 243)

ALVIN B. RUBIN, Circuit Judge, with whom TATE, Circuit Judge, joins dissenting.

Criminal law punishes the wrongdoer. It attempts to deter others lest they suffer the same fate. If the state punishes a person for conduct that he had no ability to avoid, it imposes punishment without fault. The majority opinion appears to accept these propositions for it recognizes the validity of the plea of insanity for those people who, as a result of a mental disease or defect, lack substantial capacity to appreciate the wrongfulness of their conduct. It denies the plea, however, to those persons who suffer a mental disease or defect that causes them to lack the ability to control their conduct. Therefore, even were the issue of the legal definition of insanity properly before the court, I could not join in the decision to draw a line between these two kinds of mental illness. That distinction is constructed on faulty premises and erodes the moral integrity of our criminal justice system.

The majority offers several reasons for its decision both to reexamine and to change the method by which we determine who is criminally responsible. It suggests that "new policy considerations" justify reexamination of the ALI-Model Penal Code test. It expresses concern over the risk of "fabrication" and "moral mistakes" created when experts testify about whether the defendant has the capacity to control his behavior and the risk of confusing juries with psychiatric testimony. Finally, the majority finds reassurance in one doctor's testimony before a congressional committee that the volitional test is "superfluous" for "*most* psychotic persons." (Emphasis supplied.)

The insanity defense reflects the fundamental moral principles of our criminal law. An adjudication of guilt is more than a factual determination that the defendant pulled a trigger, took a bicycle, or sold heroin. It is a moral judgment that the individual is blameworthy. "Our collective

conscience does not allow punishment where it cannot impose blame."[1] Our concept of blameworthiness rests on assumptions that are older than the Republic: "man is naturally endowed with these two great faculties, understanding and liberty of will."[2] "[H]istorically, our substantive criminal law is based on a theory of punishing the viscious will. It postulates a free agent confronted with a choice between doing right and wrong, and choosing freely to do wrong."[3] Central, therefore, to a verdict of guilty is the concept of responsibility. Recognition of the insanity defense rests on the conclusion that "it is unjust to punish a person who because of mental illness is without understanding of the nature or quality of his conduct and lacks the capacity to conform his behavior."[4] An acquittal by reason of insanity is a judgment that the defendant is not *guilty* because, as a result of his mental condition, he is unable to make an effective choice regarding his behavior.[5]

The majority does not controvert these fundamental principles; indeed it accepts them as the basis for the defense when the accused suffers from a disease that impairs cognition. It rests its decision to redefine insanity and to narrow the defense on "new policy considerations." The opinion does not fully articulate these considerations, but I discuss what appear to be the principal ones.

The first is the potential threat to society created by the volitional prong of the insanity defense. Public opposition to any insanity-grounded defense is often based, either explicitly or implicitly, on the view that the plea is frequently invoked by violent criminals who fraudulently use it to evade just punishment. Some critics perceive the insanity defense as an opportunity for criminals to use psychiatric testimony to mislead juries. This perception depicts an insanity trial as a "circus" of conflicting expert testimony that confuses a naive and sympathetic jury. And it fears insanity acquittees as offenders who, after manipulating the criminal justice system, are soon set free to prey once again on the community.[6]

Despite the prodigious volume of writing devoted to the plea,[7] the empirical data that are available provide little or no support for these fearsome perceptions and in many respects directly refute them. Both the frequency and the success rate of insanity pleas are grossly overestimated by professionals and lay persons alike; the plea is rarely made, and even more rarely

1. *Holloway v. United States,* 148 F.2d 665, 666–67 (D.C.Cir.1945).

2. M. Hale, *The History of Pleas of the Crown,* (1736), *quoted in* P. Low, J. Jeffries, & R. Bonnie, Criminal Law, *Cases and Materials* 653 (1982).

3. *Morissette v. United States,* 342 U.S. 246, 250 n. 4, 72 S.Ct. 240, 243 n. 4, 96 L.Ed. 288, 293 n. 4 (1952) (quoting Pound, Introduction to Sayre, Cases on Criminal Law (1927)).

4. D. Hermann, *The Insanity Defense: Philosophical, Historical, and Legal Perspectives* 128–52 (1983) (hereinafter D. Hermann, *The Insanity Defense* ). *See* G. Morris, *Acquittal By Reason of Insanity, in Mentally Disordered Offenders* 65 (J. Monahan and H. Steadman, eds. 1983) [hereinafter, G. Morris, *Acquittal* ].
For a history of the insanity defense, see generally D. Hermann, *The Insanity Defense, supra,* at 18–58; A. Platt and B. Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and Its Subsequent Development in the*

*United States,* in The Psychological Foundations of Criminal Justice 51–78 (R. Richer & H. Vetter, eds. 1978).

5. H. Gross, 'A *Theory of Criminal Justice* 306 (1979).

6. *See, e.g.,* W. Winslade and J. Ross, The Insanity Plea 2 (1983). *See generally,* Hermann, *supra,* note 4 at 987–88 & nn. 3–6 (citing popular press); Steadman and Cocozza, *Selective Reporting and the Public's Misconceptions of the Criminally Insane,* 41 Public Opinion Quart. 523 (1978) (discussed in Pasewark, *Insanity Plea: A Review of the Research Literature,* 9 J. Psychiatry & L. 357, 359 (1981) [hereinafter Pasewark, *Research Literature* ]; National Mental Health Association, *Myths & Realities: A Report of the National Commission on the Insanity Defense,* passim (1983) (hereinafter, National Commission, *Myths & Realities.*).

7. *See* A. Goldstein, *The Insanity Defense* 3 (1967) (insanity defense is most talked-about issue in criminal law).

successful.[8] The number of insanity pleas based on control defects, as compared to those based on lack of cognition, must have been almost negligible.

The perception that the defendant who successfully pleads insanity is quickly released from custody is also based only on assumption. Although an acquittal by reason of insanity ends the criminal jurisdiction of federal courts (except in the District of Columbia), and of the courts of a few states, the acquittee is not simply set free. "The truth is that in almost every case, the acquittee is immediately hospitalized and evaluated for dangerousness. Usually, the acquittee remains hospitalized for an extended time."[9]

In sum, the available evidence belies many of the assumptions upon which much popular criticism of the insanity defense are based. The plea is rarely invoked, usually fails, and, when it is successful, the acquittees rarely go free.

Another set of objections to the plea is based on the thesis that factfinders—especially juries—are confused and manipulated by the vagueness of the legal standards of insanity and the notorious "battle of the experts" who present conclusory, superficial, and misleading testimony. These conditions, the argument runs, conspire to produce inconsistent and "inaccurate" verdicts.

Let us first put these objections in perspective. Most cases involving an insanity plea do not go to trial; instead, like most other criminal cases, they are settled by a plea bargain. In many of the cases that do go to trial, psychiatric testimony is presented by deposition, without disagreement among experts, and without opposition by the prosecution.[10] And in the few cases in which a contest does develop, the defend-

---

8. For example, one extensive study examined the opinions held by college students, the general public, state legislators, law enforcement officers, and mental health personnel in Wyoming. Estimates of the frequency with which criminal defendants entered the plea ranged from 13% to 57%. During the time period considered, however, the actual frequency was only 0.47%: one case in 200. Similarly, although estimates of its success rate varied from 19% to 44%, during the relevant period only one of the 102 defendants who entered the plea was acquitted by reason of insanity. Pasework, *Research Literature, supra* note 10, at 360–61. *See also* National Commission, Myths & Realities, *supra,* note 6, at 14–15; A. Goldstein, *The Insanity Defense* 23–24 (1967). One compendious British study, encompassing selected periods from 1740 to 1930, found the frequency of the plea to range between .29% to 1.30% with a success rate varying between 28.5% and 69.6%. 1 N. Walker, *Crime and Insanity in England* 67 (1968); 2 N. Walker and S. McCabe, Crime and Insanity in England (1973) (*Cited in* Pasework, *Research Literature* at 361–62).

A somewhat dated survey of major metropolitan areas in the United States reported similar conclusions, finding that insanity pleas were rarely entered. The highest figures were obtained in California and the District of Columbia, where the data showed the plea was invoked in 1.3% and 5.1% of all felony dispositions respectively). A. Matthews, *Mental Disability and the Law* 26–30 (1970). *See also* National Commission, Myths & Realities at 15 (1983).

One source estimates fewer than 100 successful insanity pleas out of 50,000 federal criminal cases brought annually. Dershowitz, *Abolishing the Insanity Defense: The Most Significant Feature of the Administration's Proposed Criminal Code—An Essay,* 9 Crim.L.Bull. 434, 436 (1973).

9. Rappeport, The Insanity Plea Scapegoating the Mentally Ill—Much Ado About Nothing?, 24 So. Tex.L.J. 687, 698 (1983). *See also,* National Commission, *Myths & Realities, supra* note 6 at 25 ("The Commission found that virtually all insanity acquittees spend significant time in hospitals."). *See* A. Goldstein, *The Insanity Defense,* 143–44 (1967). *See generally,* Note, *Commitment Following an Insanity Acquittal,* 94 Harv.L.Rev. 605, 605–06 & nn. 2–6 (1981) (collecting statutes); A. Brooks, *Law, Psychiatry and the Mental Health System* (1974). Other studies support this finding. Steadman and Braff found that "fully 40%" of those persons acquitted by reason of insanity in New York between 1965 and 1976 were still hospitalized in 1978. For the 1976–1978 group, almost 90% were still hospitalized at the end of the follow-up period. Steadman & Braff, *Defendants Not Guilty By Reason of Insanity, in Mentally Disordered Offenders* 109, 111, 118–19 (J. Monahan & H. Steadman eds. 1983). These investigators' results were similar to those of New Jersey and Ontario studies. *Id.* at 116.

10. The Insanity Defense: Hearings Before The Comm. on the Judiciary of the United States Senate on Bill to Amend Title 18 to Limit the Insanity Defense, 97th Cong.2d Sess. 267, 268 (Remarks of Richard Bonnie).

ant is usually convicted.[11] Hence the stereotypic "circus tent" may be raised in only a handful of cases.

The manipulated-jury argument is supported largely by declamation, not data. Although there is some evidence to support the assertion that the wording of the insanity defense has little impact on trial outcomes,[12] one major study of jury reactions to criminal cases involving the insanity defense reached conclusions contrary to the assumption that the jury function is usurped by expert testimony. That study found that jurors responsibly and carefully consider the evidence presented, do recognize that the final responsibility for the defendant's fate rests with them, do appreciate the limits and proper use of expert testimony, and do grasp the instructions given them.[13] Although the evidence does not warrant the conclusion that juries function better in insanity trials than in other criminal cases, it certainly does not appear that they function *less* effectively. And no source has been cited to the court to support the conclusion that, as an empirical matter, pleas based upon the volitional prong present an especially problematic task for the jury.

Indeed, the majority opinion does not assert that the insanity defense, particularly the control test, *doesn't* work; it contends that the defense *can't* work. The principal basis for this contention is the belief, held by "a majority of psychiatrists," that they lack "sufficient accurate scientific bases for measuring a person's capacity for self-control or for calibrating the impairment of that capacity." This argument raises practical and important questions regarding the usefulness of expert testimony in determining whether a person has the ability to conform his conduct to law; but the absence of useful expert evidence, if indeed there is none, does not obviate the need for resolving the question whether the defendant ought to be held accountable for his criminal behavior.[14]

Accountability for criminal conduct involves more than mere *actus reus;* it also involves the mental state with which the act is performed.[15] Factfinders are required by law to determine the existence or non-existence of many mental states, for example, whether the defendant was mistaken; acted from necessity, duress, or coercion; acted without willfulness or knowledge or intention;[16] or was unable to appreciate the wrongfulness of his conduct.

Our concept of responsibility in this sense is not limited to observable behavior: it embraces *meaningful* choice, and necessarily requires inferences and assumptions regarding the defendant's unobservable mental state. The accompanying external circumstances in cases such as coercion are of course observable; but their effect on the defendant's mental state is inferred, and no more tangible than the mental processes of a defendant pleading the control test. The difference between the concepts of excusing circumstances such as coercion and the insanity defense is that the former is based on objective assumptions about human behavior and is tested against hypothetical-objective standards such as "the reasonable person." "The insanity defense

---

11. *See supra,* note 8.

12. *See generally,* Pasewark, *Research Literature, supra* note 6, at 385–90 (comparing studies that reach conflicting results).

13. R. Simon, *The Jury and the Defense of Insanity* 89, 175–77 (1967). Rita Simon's study re-enacted actual criminal cases before subject juries drawn from local jury pools. Another study, however, found poor comprehension rates among most juries exposed to various instructions on the insanity defense. Arens, Granfield, & Susman, *Jurors, Jury Charges and Insanity,* 14 Catholic L.Rev. 1 (1965). The significance of Arens's study is drawn into question by the authors' failure to compare juror comprehension of instructions in non-insanity cases.

14. *See* Hermann, Book Review, 51 Geo. Washington L.Rev. 329, 338 (1983).

15. J. Hall, *General Principles of Criminal Law* 251–54 (2d ed. 1960) (discussing causation and criminal responsibility). *See generally,* D. Jones, *Crime and Criminal Responsibility* 30–34 (1978) (discussing general intent).

16. *See* W. LaFave & A. Scott, *Handbook on Criminal Law* § 27, at 191–95 (1972).

[on the other hand] marks the transition from the adequate man the law demands to the inadequate man he may be." [17]

The relevant inquiry under either branch of the insanity test is a subjective one that focuses on the defendant's actual state of mind. Our duty to undertake that inquiry is not based on confidence in the testimony of expert witnesses, but on the ethical precept that the defendant's mental state is a crucial aspect of his blameworthiness. [18] The competence of psychiatrists or other experts thus is not the issue. The issue is whether a defendant should be held accountable for his conduct. The availability of expert testimony and the probative value of such testimony are basically evidentiary problems that can be accommodated within the existing test.

A recent Second Circuit case demonstrates that the volitional test can be reasonably cabined to prevent abuse. In *United States v. Torniero*,[19] the court affirmed the trial court's refusal to allow the defendant to present evidence that his compulsive gambling disorder rendered him unable to refrain from interstate transportation of stolen jewelry. The Second Circuit established two guidelines: (1) a defendant

seeking to rely on a newly recognized disorder to meet the volitional test must show "that respected authorities in the field share the view that the disorder is a disease or defect that could have impaired the defendant's ability to desist from the offense charged ..."; and (2) the alleged disease or defect must be relevant to the crime charged. The first issue was sharply disputed at a pretrial hearing, and the trial court found in favor of the government. The circuit court upheld that finding and went on to conclude that "a compulsion to gamble, even if a mental disease or defect, is not, *ipso facto*, relevant to the issue whether the defendant was unable to restrain himself from non-gambling offenses such as transporting stolen property." [20]

Even the few cases in which the trial develops into a battle of experts provide no basis for the majority's conclusion that the prosecution faces an "all but impossible task." The prosecution appears to be able to locate experts as readily as the defense. Indeed, a defendant pleading insanity typically faces both a judge and a jury who are skeptical about psychiatry in general and the insanity plea in particular.[21] Sharply

---

17. A. Goldstein, *The Insanity Defense* 18 (1967).

18. Some writers further object that psychiatry, based as it is on a deterministic view of human behavior, can never profitably be reconciled with the law's premise of free will, and thus reliance on such testimony threatens to erode individual responsibility. *See e.g.*, Statement of David Robinson, Jr., Senate Hearings, *supra* note 10, at 73. This objection is misdirected. Although the social-scientific viewpoint is undeniably deterministic, the insanity defense actually contributes to the moral authority that criminal law derives from its free-will basis. As Professor Alan Stone observed,

[W]hat is a court to do when it confronts a case so bizarre and so incongruous that all the premises of criminal law, including free will, seem inappropriate? Should the court simply grit its teeth and go on? The court is then in that ludicrous position of the American tourist who assumes that if he speaks English loud enough, the foreigners will understand him. If so, the criminal law risks demeaning itself, risks demonstrating that its language is not universal, its moral comprehension not encompassing. How much wiser for the criminal law instead to have an escape hatch, not only to avoid embarrassment, but also be-

cause by obverse implication every other defendant does have free will. Thus, the insanity defense is in every sense the exception that proves the rule. It allows the court to treat every other defendant as someone who chose "between good and evil."

A. Stone, *Mental Health and Law: A System in Transition* 222 (1975). *See also* A. Goldstein, *The Insanity Defense* 224 (1967); Hermann, *Assault on the Insanity Defense: Limitations on the Effectiveness and Effect of the Insanity Defense*, 14 Rutgers L.J. 241, 252 (1983).

19. 735 F.2d 725, 730–31 (2d Cir.1984).

20. *Id.* at 731–32.

21. A. Goldstein, *The Insanity Defense* 42 (1967). *Cf.* Hermann, *supra* note 4, at 1003–04 (insanity defense, unlike provocation defense, "does not create a situation in which the juror is expected to empathize with the emotional reaction of a defendant"; on the contrary, it is based on the idea that he is so different from persons capable of rational conduct that normal standards of guilt do not apply); Arafat & McCahery, *The Insanity Defense and the Juror*, 22 Drake L.Rev. 538, 548 (1973) (presence among jurors of an

adversarial presentation of conflicting psychiatric testimony may increase this skepticism, and thus make acquittal more unlikely. Usually the defendant will have been adjudicated sane enough to understand the proceedings against him and to assist in his defense; otherwise he would be incompetent to stand trial. The formal allocation of the persuasion burden notwithstanding, the defendant to prevail must convince the doubting factfinder that, despite present outward appearances, he was insane at the time he committed the crime.

The majority's fear that the present test invites "moral mistakes" is difficult to understand. The majority opinion concedes that some individuals cannot conform their conduct to the law's requirements. Other writers have concluded that a strictly cognitive insanity test will overlook some individuals who would be covered by a control test.[22] Without citing any data that verdicts in insanity cases decided under a control test are frequently inaccurate, the majority embraces a rule certain to result in the conviction of at least some who are not morally responsible and the punishment of those for whom retributive, deterrent, and rehabilitative penal goals are inappropriate. A decision that virtually ensures undeserved, and therefore unjust, punishment in the name of avoiding moral mistakes rests on a peculiar notion of morality.

I do not speak in this dissent to the merits of a new system for determining criminal responsibility that would not merely redefine the insanity plea but would reform the entire trial process and the treatment of those who are not absolved. Such a system would eliminate the concept of guilty mind or criminal intent as an element of most offenses; and it would consider such matters, including insanity, at a dispositional proceeding separate from a determination whether the defendant committed the act.[23] Unlike the majority, those who propose such reform thus make provision to take account for the mentally ill offender's condition at some point in the process. This view requires a revision of our criminal justice system from a punitive to a preventive basis, not merely a change in the definition of insanity; for it rejects the concept of such a defense. I do not address the question whether such a system would be better or worse. Adoption of the view would require legislative changes in our trial system and changes in our institutional treatment of at least some convicted persons.

This dissent is directed only at the amputation of one part of a comprehensive definition. That definition is itself an integral part of a social mechanism that begins with a prosecutorial decision about whether a particular defendant should even be charged and ends with three possible results: not guilty and free, guilty and sentenced, not guilty by reason of insanity and committed.[24]

Judges are not, and should not be, immune to popular outrage over this nation's crime rate. Like everyone else, judges watch television, read newspapers and magazines, listen to gossip, and are sometimes themselves victims. They receive the message trenchantly described in a recent book criticizing the insanity defense: "Perhaps the bottom line of all these complaints is that *guilty people go free*—guilty people who do not have to accept judgment or responsibility for what they have done and

---

unfavorable attitude toward psychiatry strongly associated with decision against insanity plea; presence of favorable attitude had no association with decision).

**22.** *See, e.g., supra* note 19 (observations of Rappeport); Insanity Defense in Federal Courts: Hearings Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 97th Cong., 2d Sess. 231 (Statement of Stephen Morse).

**23.** *See* B. Wooton, *Crime and the Criminal Law* 52–53 (1963); Wooton, *Book Review,* 77 Yale L.J. 1019, 1029–32 (1968) (applying her views specifically to the insanity defense while reviewing A. Goldstein, *The Insanity Defense* ). *See also* Hermann, Book Review, 44 Ohio State L.J. 987, 996 (1983) (criticizing Wooton's position).

**24.** These three are the possibilities in effect. The federal courts, of course, allow for only two verdicts: guilty or not guilty.

are not held accountable for their actions.... These are not cases in which the defendant is *alleged* to have committed a crime. *Everyone knows he did it.*"[25] Although understandable as an expression of uninformed popular opinion, such a viewpoint ought not to serve as the basis for judicial decisionmaking; for it misapprehends the very meaning of guilt.

Guilt is the legal embodiment of moral and philosophical concepts. As discussed above, those concepts presuppose a morally responsible agent to whom guilt can be attributed.[26] By definition, guilt cannot be attributed to an individual unable to refrain from violating the law. When a defendant is properly acquitted by reason of insanity under the control test, the guilty does not go free.

The majority opinion is a radical departure from the established jurisprudence of every federal circuit that has spoken on the issue. It is based only on intuitive reactions and the published recommendations, to which no one has testified, of a few professional groups. We would permit no jury to decide even an unimportant issue on such hearsay. The purposes to be served by this innovation are unclear, for it is doubtful that the decision will make the slightest impact on the enormous problem of crime. Its effect will be felt by only two small groups: a few who otherwise might have made a case for the jury but who will be deprived of a plea that in any event would likely have been bootless, and those few unfortunate persons so afflicted by mental disease that they knew what the law forbade but couldn't control their actions sufficiently to avoid violating it. The nature of their illness makes punishment useless as a means to compel them to behave lawfully; only remission of the disease will permit change. By convicting them we will not deter others who suffer the same mental defect; they too, again by definition, have no ability to obey.

In sum, I cannot join in a decision that, without supporting data, overturns a widely used rule that has not been shown to be working badly in order to adopt a change that will likely produce little or no practical benefit to society as a whole, conflicts with the fundamental moral predicates of our criminal justice system, and may inflict undeserved punishment on a few hapless individuals.

---

**25.** W. Winslade & J. Ross, *The Insanity Plea* 2–3 (1983) (emphasis added).

**26.** *See generally,* H. Gross, *A Theory of Criminal Justice* 306 (1979); J. Robinson, *Book Review,* 59 Notre Dame L.Rev. 297, 308–09 (1983).