ACCEPTED
04-14-00126-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
1/30/2015 12:13:05 PM
KEITH HOTTLE
CLERK

**Court of Appeals No. 04-14-00126-CR**
**Trial Court Cause No. 5226**

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
1/30/2015 12:13:05 PM
KEITH E. HOTTLE
Clerk

**IN THE FOURTH SUPREME JUDICIAL DISTRICT**

**COURT OF APPEALS**

**SAN ANTONIO, TEXAS**

_____

*JOEL PRICE MORRIS*

*v.*

*THE STATE OF TEXAS*
_____

**APPEALED FROM THE 216TH JUDICIAL DISTRICT COURT,**
**KENDALL COUNTY, TEXAS**
**Honorable N. Keith Williams, Presiding**

_____

*APPELLANT'S BRIEF*

_____

**M. Patrick Maguire**
**State Bar No. 24002515**
**M. Patrick Maguire, P.C.**
**mpmlaw@ktc.com**
**945 Barnett Street**
**Kerrville, Texas 78028**
**Telephone (830) 895-2590**
**Facsimile (830) 895-2594**

*ATTORNEY FOR APPELLANT,*
*JOEL PRICE MORRIS*

# *TABLE OF CONTENTS*

IDENTITY OF PARTIES & COUNSEL                                    2

INDEX OF AUTHORITIES                                             4

STATEMENT OF THE CASE                                           6

ISSUES PRESENTED                                                7

SUMMARY OF THE ARGUMENTS                                        8

CERTIFICATE OF COMPLIANCE WITH TRAP 9.4                         9

STATEMENT OF FACTS                                             10

ARGUMENTS & AUTHORITIES                                        11

ISSUE 1:    The jury's implicit finding that Appellant was not insane at the time of the offense is so against the great weight and preponderance of the evidence as to be manifestly unjust.                             11

PRAYER FOR RELIEF                                              31

CERTIFICATE OF SERVICE                                         32

## IN THE FOURTH SUPREME JUDICIAL DISTRICT

## COURT OF APPEALS

## SAN ANTONIO, TEXAS

_____

*JOEL PRICE MORRIS*

*v.*

*THE STATE OF TEXAS*
_____

*IDENTITY OF PARTIES & COUNSEL*
_____

*Appellant certifies that the following is a complete list of the parties, attorneys, and any other person who has any interest in the outcome of this appeal:*

Appellant:                        Joel Price Morris

Appellee:                         The State of Texas

Attorney for Appellant:           M. Patrick Maguire
                                  M. Patrick Maguire, P.C.
                                  945 Barnett Street
                                  Kerrville, Texas 78028

Attorney for Appellee:            Hon. E. Bruce Curry
                                  216th Judicial District Attorney
                                  200 Earl Garrett, Suite 202
                                  Kerrville, Texas 78028

Trial Judge:                    Hon. N. Keith Williams
                                216th Judicial District Judge
                                700 Main Street
                                Kerrville, Texas 78028

# INDEX OF AUTHORITIES

## *CASES*

*Aschbacher v. State*,
61 S.W.3d 532 (Tex. App.—San Antonio 2001, pet. ref'd)          11

*Bigby v. State*, 892 S.W.2d 864 (Tex. Crim. App. 1994)          27

*Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)          12, 30

*Graham v. State*, 566 S.W.2d 941 (Tex. Crim. App. 1978)          11, 26

*Matlock v. State*, 392 S.W.3d 662 (Tex. Crim. App. 2013)          12, 30

*Meraz v. State*, 785 S.W.2d 146 (Tex. Crim. App. 1990)          12

*Morgan v. State*, 869 S.W.2d 388
(Tex. App.—Tyler 1993, pet. ref'd)          30

*Plough v. State*,
725 S.W.2d 494 (Tex. App.—Corpus Christi 1987, no pet.)          11

*Ruffin  v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2008)          23

*United States v. Lyons*, 739 F.2d 994 (5th Cir. (Tex.) 1984)          27

*Van Guilder v. State*, 709 S.W.2d 178 (Tex. Crim. App. 1985)          12, 26
28-30

# *STATUTES AND RULES*

*Tex. Penal Code §2.04(d)*                                    11

*Tex. Penal Code §8.01(a)*                                    11

## *STATEMENT OF THE CASE*

Appellant, Joel Price Morris, is appealing his conviction for the offense of murder. Appellant pled not guilty by reason of insanity on January 8, 2014. RR 6, 11. The jury found Appellant guilty and sentenced him to life imprisonment. RR 8, 196. Appellant filed his notice of appeal with the trial court on February 8, 2014. This brief is timely filed by being electronically filed with the Fourth Court of Appeals on January 30, 2015.

## *APPELLANT'S ISSUES PRESENTED FOR REVIEW*

**I.**      The jury's implicit finding that Appellant was not insane at the time of the offense is so against the great weight and preponderance of the evidence as to be manifestly unjust.

**\*\***     For purposes of reference in the Appellant's Brief the following will be the style used in referring to the record:

     1.     Reference to any portion of the Court Reporter's Statement of Facts will be denoted as "(RR____, ____)," representing volume and page number, respectively.

     2.     The Transcript containing the District Clerk's recorded documents will be denoted as "(CR___, ___)."

# *SUMMARY OF THE ARGUMENTS*

**I.** The evidence at trial clearly showed Appellant suffered from a severe mental illness. The evidence at trial also showed that Appellant believed that killing his father was the right and just thing to do as a result of Appellant's delusions that Appellant's father was evil, that Appellant was essentially the savior of the world, and by ridding the world of his father, Appellant would receive great rewards. The jury's rejection of Appellant's insanity defense is so against the great weight and preponderance of the evidence as to be manifestly unjust.

## *<u>CERTIFICATE OF COMPLIANCE</u>*

Pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, I certify that this brief contains 5,718 words (counting all parts of the document and relying upon the word count feature in the software used to draft this brief).  The body text is in 14 point font and the footnote text is in 12 point font.

/s/  M. Patrick Maguire
M. Patrick Maguire,
Attorney for Appellant

## STATEMENT OF FACTS

On April 3, 2011, Appellant arranged to eat lunch with his parents at their home in Boerne, Texas. RR 6, 39. Appellant was going to get some barbecue to bring over for lunch. RR 6, 40.

Appellant arrived at his parent's home in the early afternoon on April 3, 2011. He walked into the house with a semi-automatic pistol and sought out his father who was hanging curtains in a back bedroom. Appellant walked past his mother, who was standing near the kitchen, and cornered his father in the bedroom. RR 6, 41-42. Appellant then shot his father in the torso 8 times. RR 6, 43. Appellant left the house, went back out to his car, loaded an additional three rounds of ammunition in the pistol's magazine, went back in the house and shot his father in the head three more times. RR 6, 45. Appellant then left the house, got in his car and drove off. Appellant was stopped by law enforcement officers and arrested. RR 6, 75-76.

Appellant suffered from severe schizophrenia which led to delusions that his father was molesting him, that his father was evil, essentially Satan, and that Appellant was commanded by God to kill his father. RR 8, 20. Appellant pled not guilty by reason of insanity. RR 6, 11. The jury rejected Appellant's insanity defense, convicted him of murder, and sentenced him to life imprisonment. RR 8, 196.

# ARGUMENTS & AUTHORITIES

## I.
### *The jury's implicit finding that Appellant was not insane at the time of the offense is so against the great weight and preponderance of the evidence as to be manifestly unjust.*

### A. *Standard of Review*

It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong. *Tex. Pen. Code Ann. § 8.01(a)*. The burden is on the accused to prove the defense by a preponderance of the evidence. *Id.* § 2.04(d). Although expert medical testimony may aid the jury in its ultimate determination, it is not conclusive on the issue. *Plough v. State*, 725 S.W.2d 494, 499 (Tex. App.—Corpus Christi 1987, no pet.).

Whether insanity exonerates one from a criminal act involves medical, legal, and ethical considerations. *Graham v. State*, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978). To incorporate the legal and ethical elements, a jury should consider all of the evidence surrounding the offense. *See id.* at 951. The trier of fact may consider such evidence as the Appellant's demeanor before and after the offense, attempts to evade police, attempts to conceal incriminating evidence, expressions of regret or fear of the consequences of his actions, other possible motives for the offense, and other explanations for his behavior. *Aschbacher v. State*, 61 S.W.3d 532,

11

535 (Tex. App.—San Antonio 2001, pet. ref'd). Only the jury can join the non-medical components that must also be considered in deciding the ultimate issue. *Graham*, 566 S.W.2d at 949.

While jurors may reject the opinion of experts if it does not comport with their ideas of sound logic, and they are not required to give conclusive effect to the opinion of experts, ***jurors may not arbitrarily disregard such testimony***. *Van Guilder v. State*, 674 S.W.2d 915, 919 (Tex. App.—San Antonio, 1984), *affirmed*, 709 S.W.2d 178 (Tex. Crim. App. 1985). (emphasis added).

The Court of Criminal Appeals has determined that the courts of appeals are constitutionally empowered to determine whether factually sufficient evidence supports the elements of a defendant's affirmative defense. *Matlock v. State*, 392 S.W.3d 662 (Tex. Crim. App. 2013); *Clewis v. State*, 922 S.W.2d 126, 129-30 (Tex. Crim. App. 1996). In fact, the Court of Criminal Appeals has expressly held that the courts of appeals have conclusive jurisdiction over "questions of fact" concerning the proof of an issue on which the defendant has the burden of proof and the burden of persuasion. *Meraz v. State*, 785 S.W.2d 146, 153-54 (Tex. Crim. App. 1990). The *Meraz* Court recognized that it had no power to disturb a "question of fact" determined by a court of appeals in holding that "we now

join our brethren on the Texas Supreme Court and conclude that the "factual conclusivity clause," within Art. V, § 6 [of the Texas Constitution], operates to limit our jurisdiction and confers conclusive jurisdiction on the courts of appeals to resolve questions of weight and preponderance of the evidence adequate to prove a matter that the defendant must prove. Moreover, when the courts of appeals are called upon to exercise their fact jurisdiction, that is, examine whether the appellant proved his affirmative defense or other fact issue where the law has designated that the defendant has the burden of proof by a preponderance of evidence, the correct standard of review is whether after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust." *Id*. In essence, the courts of appeals are the "final stop" regarding whether a jury's verdict regarding the issue of insanity is so against the great weight and preponderance of the evidence as to be manifestly unjust.

### B. *Analysis*

### *Evidence of Insanity*

The evidence of insanity that was presented at Appellant's trial was extensive. The common thread of Appellant's mental illness, and insanity at the time the offense was committed, ran through all the testimony of those

familiar with Appellant. Given the fact-intensive nature of the analysis that this Court must undertake, it is important to highlight various portions of the evidence that establish Appellant's longstanding history of mental illness, culminating in the acts that occurred on the day of the murder. Because both the State's expert and the Appellant's expert agreed at trial that Appellant was suffering from a severe mental illness, and the issue was whether Appellant was unable to appreciate the wrongfulness of his conduct, Appellant has set out excerpts of fact-witness testimony, much of which comes from the State's case-in-chief, that supports Appellant's affirmative defense of insanity, including his lengthy history of mental illness, and frequent bizarre behavior. The following excerpts are set out both for the Court's convenience and to demonstrate the overwhelming evidence of insanity in this case.

### *Claudia Morris*

Claudia Morris, Appellant's mother, was the State's first witness. Ms. Morris testified that Appellant had chronic mental illness consisting of schizophrenia which got so severe that in 2008, Appellant was no longer able to work. RR 6, 38. Appellant's paranoia in 2008 centered around the government and people spying on him. RR 6, 48. Appellant actually attacked his father at work one day and other co-workers of Appellant were

very troubled by Appellant's bizarre behavior. RR 6, 48. Appellant was committed to a mental hospital for several months as a result of his illness. RR 6, 48-49. Appellant had multiple hospitalizations thereafter. RR 6, 50. Ms. Morris confirmed that Appellant actually tried to poke his own eye out because he believed a device had been implanted to monitor him. RR 6, 50. Appellant was treated twice at San Antonio State Hospital for schizophrenia. RR 6, 51. Appellant's schizophrenia, and the delusions brought on by the disease, deteriorated to the point that Ms. Morris and her husband had to obtain a protective order seeking protection from Appellant. RR 6, 38; RR 6, 52.

### Roger Baker

Roger Baker, a Kendall County deputy, was called by the State. Deputy Baker related a story where Appellant came in to talk to him and said that he had a microchip in his head. RR 6, 194. Appellant complained that his father "medically induced" him in to trauma and sexually abused Appellant. RR 6, 194.

### Wade Canavan

Wade Canavan was called by the defense. Wade is Appellant's cousin. RR 7, 72. Wade testified about an incident that occurred about three to six months prior to the killing where Appellant came to Wade's house

rambling about filing a report that Appellant was being molested by his father. RR 7, 75-79. Wade became frightened when Appellant said he was going to kill his father. RR 7, 76. Wade became so alarmed that he had his daughter leave the house while Wade tried to calm Appellant down. RR 7, 77-78. Ultimately, after cooking dinner for Appellant, taking Appellant to the police department to air his complaints, letting Appellant stay in Wade's home for the night and generally trying to get Appellant to calm down, Wade told Appellant to leave and not to return. RR 7, 80-85. His testimony further buttresses the defense claim that Appellant was suffering from delusions as a result of his mental illness, and further adds credence to Appellant's affirmative defense of insanity.

*Jeffery Clark*

Mr. Clark was a detention officer at the Kendall County Detention Center. (RR 7, 97). Mr. Clark testified to the difference in Appellant's demeanor when he was taking his medication as opposed to when Appellant was not compliant with his medication. When off medications, Appellant would act bizarre, including making strange comments and having loud outbursts. RR 7, 105. Appellant would say that he was Jesus, the son of God. RR 7, 105. Mr. Clark testified that the longer Appellant was off his medication, the more bizarre his behavior became. RR 7, 105-07. His

16

testimony generally corroborates that of others who have experience in dealing with Appellant.

## *Christopher Ortiz*

Christopher Ortiz was also a detention officer at the Kendall County detention center. Similar to Mr. Clark's testimony, Mr. Ortiz related Appellant's behavior shortly after being brought to jail after the killing and also talked about Appellant's general behavior while incarcerated. After being brought to the jail after the killing, Mr. Ortiz testified that Appellant stated that "he was relieved because he killed the only mother fucker he needed to kill." RR 7, 112. This would not appear to be the statement of someone who felt it was wrong to kill someone. Mr. Ortiz further testified that Appellant began refusing his medication while in custody. RR 7, 115. Mr. Ortiz testified that Appellant reported that his cell was electrified, that he was being gassed and he couldn't sleep. RR 7, 116. Appellant would also frequently shout, yell and curse at staff when off his medication. RR 7, 116. Mr. Ortiz stated that Appellant left for a period of time to apparently get stabilized and that upon Appellant's return, Appellant acted normal and even apologized to Mr. Ortiz for his previous behavior. RR 7, 117. Again, this is consistent with testimony from others familiar with Appellant who

testified that Appellant was like two different people depending upon whether he was taking his medication.

### *Phillip Lopez*

Phillip Lopez was also a detention officer at the Kendall County detention center. RR 7, 121. Mr. Lopez related an incident where Appellant tried to poke his eye out while in jail. RR 7, 122. On another occasion, Mr. Lopez witnessed Appellant slamming his head into a metal shelf in the jail. RR 7, 123. Appellant believed that his father had planted a camera in his eye so he was attempting to poke his eye out to remove the camera. RR 7, 124. Appellant also believed that some of the jail staff were trying to poison him. RR 7, 127.

### *Emelio Perada*

Emelio Perada is a corporal with the Kendall County Sheriff's Office. RR 7, 132. Mr. Perada also related his knowledge of Appellant trying to gouge out his eye and hitting his head against the metal shelf. RR 7, 134-35. Mr. Perada also testified that Appellant told him that "you don't need to worry about me Perada. I killed the son of a bitch that I had to." RR 7, 136. Consistent with what others relayed about Appellant's condition when Appellant was not taking his medication, Mr. Perada testified that when

Appellant was not taking his medications, he would start "acting up" and believing that guards were trying to kill him. RR 7, 137.

*Brian Skop*

One of the most important witnesses that testified concerning the issue of sanity was Dr. Brian Skop, a forensic psychiatrist who was called by the defense. RR 8, 8-9. Dr. Skop testified that the first time he met with Appellant, on March 11, 2012, it was pretty clear that Appellant was "quite psychotic." RR 8, 14. Dr. Skop testified that Appellant suffered from delusions that his father was actually his stepfather, who was an evil god, that was implanting devices into people and blackmailing people to control them as part of a secret society for the Masons. RR 8, 15. Dr. Skop testified Appellant suffers from schizophrenia which is a "very severe mental illness where people suffer from hallucinations, i.e., they hear things that aren't there, and delusions, <u>which are beliefs that they have that are so real to them that they consider it their reality</u>." RR 8, 16 (emphasis added). Dr. Skop testified that Appellant "believed that he was going to take over as God, that he was Jesus Christ and that he would rule the world. . ." RR 8, 16. Dr. Skop believed that Appellant suffers from a "severe mental disease or defect." RR 8, 19.

19

Appellant, on the day that he murdered his father, believed he was getting coded material from his "true father," who Appellant thought was the true God. RR 8, 20. The code that he would interpret on the day of the incident when he was asked to get some barbecue at Rudy's, and Appellant interpreted that R stood for "Robert" (his father), the U stood for "you," and then DY stood for "die." RR 8, 20. He believed this was a code received from his "true father" that meant "Robert, you die." RR 8, 20.

Appellant also saw codes in other areas on the day in question. For instance, Dr. Skop testified that Appellant bought four magazines for the gun that he purchased because he saw it as symbolic of the fact that his father was born in 1944. RR 8, 21.

When asked to rate the seriousness of Appellant's schizophrenia on a scale of 1 to 10, with 10 being the worst, Dr. Skop rated Appellant at a 10. RR 8, 22.

Dr. Skop watched the interview with Appellant after he was arrested for the murder. RR 8, 23. Dr. Skop testified that his impressions of Appellant were consistent with what he had come to know about Appellant. Specifically, Appellant talked about being Jesus and that killing his father was right, that it was going to end the reign of terror, and that he was going to move into a mansion after the killing. RR 8, 24. Dr. Skop also addressed

the fact that Appellant was talking about things being implanted in his body, which is a fairly common delusion that schizophrenics have. RR 8, 24.

Dr. Skop reviewed the medical records from Appellant's multiple psychiatric hospitalizations. RR 8, 25. Appellant had been treated for mental illness at North Texas State Hospital, Timberlawn Hospital, San Antonio State Hospital, Austin State Hospital, Metrocare, IntraCare Medical Center, Terrell State Hospital, Memorial Hermann Hospital, and Hill Country Mental Health and Mental Retardation. RR 8, 25-26. Appellant had been to some of these facilities on multiple occasions. These records reinforced Dr. Skop's opinion regarding Appellant's mental condition and his severe mental illness. RR 8, 26. Appellant wanting to kill his father is the reason why he was hospitalized on almost every occasion. RR 8, 27.

Dr. Skop's opinion was that as a result of Appellant's severe mental illness, Appellant did not know that what he was doing was wrong. RR 8, 29; RR 8, 34. Appellant believed that he was Jesus Christ and that his father was Satan. RR 8, 29. Appellant believed that his father had been raping and torturing Appellant his whole life and that he needed to be killed. RR 8, 29. Appellant believed that by killing his father, he would bring peace on earth, and dislodge the evil that he believed his father was perpetrating by having people murdered and by implanting devices in them. RR 8, 29. Appellant

21

thought he was doing the correct thing at that time by killing his father. RR 8, 29-30.

Dr. Skop drew a good distinction in pointing out that simply because Appellant may have known it was illegal to kill his father does not mean that in his mind, as a result of his severe mental illness, that he believed it was wrong. RR 8, 40. Even though Appellant may have known that he would be arrested for killing his father, he believed it was the morally right thing to do. RR 8, 41.

### Robert Cantu

Dr. Robert Cantu is a forensic psychiatrist who testified on behalf of the State. RR 8, 62. Dr. Cantu met with Appellant in December 2013. RR 8, 68. Dr. Cantu agreed with Dr. Skop that Appellant suffered from severe mental illness. RR 8, 73. Dr. Cantu's opinion that Appellant was legally sane at the time of the killing stemmed from evidence that he believed showed that Appellant knew the consequences of his conduct (i.e., that he would be arrested). RR 8, 90-97.

### *Evidence that Appellant did not know conduct wrong*

Essentially, Dr. Cantu's testimony that Appellant appreciated that his conduct was "wrong" was based upon the fact that Appellant knew his conduct was "legally" wrong, as opposed to morally wrong. *See, e.g., Ruffin*

*v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008) (holding that under Texas law, whether a defendant is insane turns on whether he knew his conduct was illegal). However, Dr. Cantu's testimony is blunted by several facts.

Appellant did not attempt to flee from police. He pulled over and peacefully surrendered. RR 8, 96. He threw the gun out of the car in plain view of police officers to avoid being shot. RR 8, 96. After the killing, Appellant said in the interview that he "was at peace with the world," that "he died for everyone's sins," and that he would "become king of the world." RR 8, 100. Appellant also stated that killing his father was right because it ended his "reign of terror." RR 8, 101. These are not the statements of someone who believed that his conduct was legally wrong. These are the statements of a person who believed he was both legally and morally justified in killing his father. In fact, Appellant told Dr. Cantu that he "never thought he would be wrong." RR 8, 106. In fact, Appellant apparently did not want to get shot because then he couldn't be pardoned by the President. RR 8, 118.

### *The Defense proved Appellant's Insanity*

Both experts agreed that Appellant suffered from a severe mental illness. The difference in the opinions of Dr. Skop and Dr. Cantu broke

down on whether Appellant understood that his conduct was wrong. Dr. Skop believed that Appellant did not know his conduct was wrong, and when asked whether Appellant "may" have known his conduct was illegal, he said yes. Dr. Skop did not state that he believed that Appellant knew his conduct was legally wrong.

Dr. Cantu, on the other hand, opined that Appellant's actions basically "inferred" that he knew his conduct was legally wrong. However, this opinion piles inference upon inference. Appellant's conduct was clearly "mission-oriented" in that he believed he was righteously justified and anointed to kill his father for a multitude of reasons, all of which were legally justified in his mind to protect not only himself, but the world, from the things that Appellant's delusions led him to believe his father was guilty of. For instance, Dr. Cantu suggested that Appellant's concealing the gun from his mother when he went into his father's house was indicative of the fact that he knew what he was about to do was legally wrong. RR 8, 82-83. However, this ignores the context of why Appellant was doing what he did. Appellant believed this had to be done and it is clear he took precautions to ensure that nothing would interfere with the success of his "mission." In other words, the inference is that Appellant took this action so that his mother would not try and stop or interfere with his plans to kill his father.

24

Dr. Cantu makes the same inference by stating that Appellant would not have thrown the gun out of the car window, or would have worried about getting shot, if he had done nothing wrong. RR 8, 83. Again, this ignores the context. Part of Appellant's "mission" was to reap the rewards that his delusions led him to believe he would receive as a result of his actions. Obviously, having a gun in one's hand while in the presence of a police officer is a recipe for being shot. What Dr. Cantu ignores in his analysis is that if Appellant truly believed his conduct was legally wrong, why would he discard a murder weapon in the plain view of police officers? This actually flies in the face of Dr. Cantu's analysis.

Dr. Cantu also deduced that Appellant's response to Dr. Cantu's question of why Appellant went back in the house to shoot his father a second time, and Appellant answered "I wanted to make sure I killed him, or I would go to jail" was an admission that Appellant knew that killing his father was legally wrong. RR 8, 83. However, Appellant's statement was inferring that unless Appellant did not kill his father, he would go to jail. Therefore, this statement is an indication that Appellant did not believe his actions were legally wrong. Clearly, this is the rationale of an insane individual. Finally, Dr. Cantu pointed out that Appellant drove the speed limit on the way to his father's house and when asked why he did this

Appellant responded "[s]o that I wouldn't get in trouble." RR 8, 84. This statement does not support the contention that Appellant knew that killing his father was legally wrong. It supports the contention that Appellant was focused on not doing anything to interfere with his plans (i.e., not getting stopped by the police on the way to completing his "mission").

The issue of legal insanity is not a strictly medical opinion, rather, it involves legal and ethical considerations that only a jury can decide. *Graham v. State*, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978). As a result, the issue of insanity may be determined by the total body of evidence presented, not just by the expert opinions. Therefore, in a case such as this, it is important to scrutinize the other evidence available upon which the jury could have rested their decision. This is the rationale for setting forth in Appellant's brief, the evidence of Appellant's history of mental illness.

A review of this evidence leads one to conclude that the jury arbitrarily rejected the overwhelming evidence in this case that Appellant was insane at the time of the offense. The law is clear that while a jury may accept or reject expert testimony, a jury is not free to ***arbitrarily*** reject expert testimony of insanity. *Van Guilder v. State*, 674 S.W.2d 915, 919 (Tex. App.—San Antonio, 1984), *affirmed*, 709 S.W.2d 178 (Tex. Crim. App. 1985).

Even after the offense, Appellant continued to relate his bizarre and irrational beliefs supporting why he killed his father. One of the most important aspects of Appellant's videotaped confession is that he believed that he was justified in killing his father because of the things that he believed his father had done to him and was going to do to him, as well as the threat Appellant's father posed to the world as a whole.

The issue of insanity is concerned with the subjective state of mind of the accused at the time the offense was committed, i.e., ***whether the accused appreciated the wrongfulness of his conduct***. *United States v. Lyons*, 739 F.2d 994, 998 (5th Cir. (Tex.) 1984) (holding that the relevant inquiry when determining insanity is the actual subjective state of mind of the defendant). Furthermore, the Texas Court of Criminal Appeals has held that the question of insanity should focus on whether a defendant understood the nature and quality of his action and whether it was an act he ought to do. *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994).

Appellant did not believe that what he did was wrong because he believed he was justified in taking action in order to vindicate himself for all of the evil things that his mental illness led him to believe his father had done to him, what his father was still doing to him and what his father was going to do in the future, particularly in light of the fact that he had

repeatedly been turned away by the police when Appellant complained to them.

To conclude that Appellant was not insane, the jury must basically disregard the extensive evidence of Appellant's chronic mental illness and his history of bizarre acts, and it totally ignores the core fact that Appellant had a deep-seated belief, flowing from his mental illness, that his father was evil and needed to be eliminated. The belief system that Appellant held toward his father formed the basis that his conduct was morally and legally justified, or not wrong.

### *Van Guilder v. State*

The evidence offered at trial of Appellant's insanity at the time of the offense was significant. *Van Guilder v. State*, 674 S.W.2d 915, 919 (Tex. App.—San Antonio, 1984), *affirmed*, 709 S.W.2d 178 (Tex. Crim. App. 1985). Appellant submits that the *Van Guilder* opinion is persuasive authority applicable to Appellant's case.

In *Van Guilder*, the defendant was indicted for five offenses growing out of one continuous transaction. *Id*. at 916. One indictment was for the offense of murder, and the other four indictments were for attempted murder. *Id*. The jury convicted Van Guilder of the first offense and found her not guilty by reason of insanity on the other four indictments. *Id*. Van

Guilder argued that the jury verdict was contrary to the great weight and preponderance of the evidence as to be manifestly wrong and unjust and that the verdict was contrary to the evidence as a matter of law because she had established the affirmative defense of insanity. *Id*. at 917.

Van Guilder's evidence consisted of testimony by friends, family and medical experts. Her medical history established that she was raised in an abusive family where substance abuse, physical abuse and sexual molestation were routine. *Id*. In addition to Van Guilder's lengthy history of mental illness, as related by the witnesses, four medical doctors testified that Van Guilder was insane at the time of the offenses. *Id*. at 917-18. The State offered no rebuttal testimony on the issue of insanity. *Id*. at 918.

In the *Van Guilder* case, this Court analyzed the evidence presented and held that Van Guilder established insanity as a matter of law, reversed the trial court's judgment and rendered a judgment that Van Guilder was not guilty by reason of insanity. *Id*. at 920. This Court also stated in the *Van Guilder* opinion, in dicta, that "[c]onsidering all of the evidence, we further believe that the finding by the jury of the vital fact of sanity is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. Were we to reach the great weight and preponderance of the evidence point,

we would likewise sustain it, which would result in a remand for a new trial." *Id.*

### *Morgan v. State*

Appellant submits that his case is also analogous to *Morgan v. State*, 869 S.W.2d 388, 388-89 (Tex. App.—Tyler 1993, pet. ref'd), where three medical experts examined the defendant within weeks of a shooting and all determined that he was afflicted with a severe mental disease which rendered him incapable of knowing his conduct was wrong. The defendant's relatives testified that he was "mentally sick," "withdrawn," and "way out" at the time of the shooting. Although the State offered one psychologist who examined the defendant five months after the shooting and determined he was not legally insane at the time of the shooting, the appellate court reversed the conviction and remanded for a new trial. *Id.*

### *CONCLUSION*

The authority granted in *Matlock v. State*, 392 S.W.3d 662 (Tex. Crim. App. 2013), to disagree with the fact finder's determination is appropriate when the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice.

The evidence of Appellant's insanity is compelling. Appellant submits that this is a case where the record demonstrates that the appellate court must step in to prevent a manifest injustice. Accordingly, Appellant prays this honorable court reverse the judgment of the trial court herein and remand for a new trial or render a judgment of acquittal by reason of insanity.

## *PRAYER FOR RELIEF*

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that this Honorable Court sustain the appellate contentions herein, reverse the judgment of conviction entered below and remand this cause for a new trial, or in the alternative, reverse the judgment of conviction entered below and render a judgment of acquittal by reason of insanity.

Respectfully submitted,

**M. PATRICK MAGUIRE, P.C.**


 /s/  M. Patrick Maguire
M. Patrick Maguire
State Bar No. 24002515
945 Barnett Street
Kerrville, Texas 78028
Telephone (830) 895-2590
Facsimile (830) 895-2594

**ATTORNEY FOR APPELLANT,**
**JOEL PRICE MORRIS**

31

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of Appellant's Brief to counsel for the State, Hon. E. Bruce Curry, via hand delivery, and whose address is 200 Earl Garrett, Suite 202, Kerrville, Texas 78028, on this the 30th day of January, 2015.

        /s/ M. Patrick Maguire
        M. Patrick Maguire