**Affirmed and Opinion Filed June 30, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00345-CR**

**DEMEATRICE RENEE SHEPPARD, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 397th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 071988**

## MEMORANDUM OPINION

Before Justices Nowell, Goldstein, and Breedlove
Opinion by Justice Breedlove

A jury found appellant Demeatrice Renee Sheppard guilty of injury to a child

and assessed punishment at nine years' imprisonment. *See* TEX. PENAL CODE ANN.

§ 22.04(f). In a single issue, appellant contends her trial counsel was ineffective. We

affirm appellant's conviction in this memorandum opinion. TEX. R. APP. P. 47.4.

## Background

Appellant was indicted for causing bodily injury to her niece J.L.B., age 8. In

the indictment, the State alleged that appellant intentionally or knowingly, recklessly

or by criminal negligence caused J.L.B. bodily injury by striking her with an extension cord.

J.L.B. was living with appellant and appellant's seven children on January 14, 2020. On that day, J.L.B. refused to get off the school bus on the way home from school. Mindy Schoen, then the assistant principal of the school, instructed the bus driver to bring J.L.B. back to school. There, J.L.B. told Schoen that appellant had "whooped" her with an electrical cord. J.L.B. showed Schoen injuries on her hands and legs. Schoen "quit counting after 20 marks on the back of her legs, and on the backs of her knees." Schoen immediately called the Department of Family and Protective Services (DFPS), and, at DFPS's instruction, the Sherman Police Department.

Officer Brad Bigham responded to the call. He observed J.L.B.'s injuries, which he described as "[t]hin lines across her legs and buttocks consistent with her description of being hit with a cord of some sort." Christiana Horn, then an investigator with DFPS, arrived and took J.L.B. to the Grayson County Children's Advocacy Center. Horn then took pictures of J.L.B.'s injuries. These photographs were admitted into evidence at trial as State's Exhibits 1 through 23 and published to the jury. They depicted what a medical expert later described as multiple "[l]inear and looped-mark bruises and cuts" to J.L.B.'s body.

Detective Rob Ballew then took over the investigation. He testified that J.L.B. was interviewed by Britney Barker of the Grayson County Children's Advocacy

Center later the same day. Ballew observed the interview from another room by closed-circuit TV. He then returned to the police department to continue his investigation. Later the same evening, he conducted a custodial interview with appellant at the police department. After being advised of her rights, appellant spoke with Ballew for approximately thirty-five minutes before she withdrew her consent and invoked her right to counsel. The interview was recorded. The video recording was admitted into evidence as State's exhibit 47 and was played for the jury. During the interview, appellant continuously denied any knowledge of, or responsibility for, J.L.B.'s injuries. She described J.L.B. as a "manipulative child" who had told lies at school and to other family members and had stolen things from other children and from family members. Appellant also said that J.L.B. had been "gone for weeks" at her grandmother's and had just returned home. Appellant told Ballew that J.L.B. "just lies."

J.L.B. testified at trial. She testified that the injuries shown in State's Exhibit 4, one of Horn's photographs, were caused by appellant hitting her with an extension cord. J.L.B. also testified that she had been at her great-aunt Beverly Frazier's[1] home over the Christmas holidays and had been disciplined there; she said Frazier "whooped me with a flyswatter." On cross-examination, J.L.B. admitted that she had told lies about appellant in the past.

---

[1] Some of the other witnesses referred to Frazier as J.L.B.'s grandmother, but Frazier herself testified that she is J.L.B.'s great-aunt.

–3–

Jaleah Dixon, appellant's oldest daughter, was twenty at the time of trial. She testified she was living with appellant in January 2020. She observed appellant disciplining J.L.B. for not taking a bath before she went to school:

Q. Did you actually see the defendant discipline JLB for this?

A. Yes.

Q. How did she discipline her for doing that?

A. She whooped her. She—she had her on the floor. She had her knee into her back. And [J.L.B.] was yelling she couldn't breathe. And she got an extension cord. She told one of the kids to go get it, which was me, and she whooped [J.L.B.] with it.

Q. So she actually had you go get an extension cord for her?

A. Yes.

Q. To whoop an eight-year-old kid?

A. Yes. And she was on her back. Her knee in her back, [J.L.B.] was yelling she couldn't breathe. And we all had to watch.

On cross-examination, Dixon admitted she initially told police she had not seen any beatings. She also admitted that she had done things to get back at appellant for matters unrelated to J.L.B. including making negative postings about appellant on social media and putting sugar in the gas tank of appellant's car.

J.L.B.'s great-aunt Beverly Frazier testified that J.L.B. had been visiting at her home over the Christmas holidays in 2019. She admitted to spanking J.L.B. with a belt during that visit. She hit J.L.B. on her bottom, not her legs, and did not use an extension cord.

Britney Barker of the Children's Advocacy Center testified generally about conducting interviews with children before turning to the specific interview with J.L.B. on January 14, 2020. She talked about the Center's procedures for forensic interviews and "red flags" she looks for to determine if a child has been coached or influenced to make a false allegation. She discussed her interview with J.L.B., noting that J.L.B. was able to give sensory details, was consistent, and did not appear to have been coached. J.L.B. told her that appellant got an extension cord and hit her on the legs. When appellant broke her own fingernail, she hit J.L.B. harder on the legs, and also hit J.L.B. on the hand. J.L.B.'s fingers swelled for two days afterwards. She had bruises on her hands and legs. J.L.B. said the blood soaked through the tights she was wearing.[2]

Dr. Suzanne Dakil, a medical doctor who is board certified in pediatrics and child abuse pediatrics, was the State's final witness. She testified that she made a "forensic assessment" of J.L.B.'s injuries by reviewing photographs and other background information. She discussed J.L.B.'s injuries in detail, describing them as "[l]inear and looped-mark bruises and cuts to her body" on both legs. She concluded the injuries indicated that J.L.B. "was hit with a flexible object repeatedly," and were consistent with being hit with an extension cord. She opined that the injuries were excessive and were indicative of child abuse.

---

[2] Two pairs of bloodstained tights or leggings were found by police in a bin of J.L.B.'s clothes at appellant's home. They were photographed, and the photographs were admitted into evidence at trial.

Appellant testified before the jury in the first phase of the trial. She denied that she injured J.L.B. She denied seeing J.L.B.'s injuries. She testified that J.L.B. was lying about who caused the injuries.

But she conceded:

Q.    If you believed that someone whooped a kid and caused those injuries, would that upset you?

A.    It would if I knew they did it. If I knew that a person did it, I would say, hey, yes, it would bother me. If I knew they did it, of course it would.

The jury found appellant guilty of intentional or knowing injury to a child. During the punishment phase, J.L.B. and Frazier again testified for the State. The State also called Tracy Knight, a communication supervisor at the Sherman Police Department. Knight testified about a 911 call received the previous day. A recording of the call was admitted into evidence and played for the jury. This evidence showed that shortly after the jury's verdict the previous afternoon, appellant called the police department seeking a warrant against Dixon, her daughter who had testified against her earlier in the day.

Three witnesses testified on appellant's behalf during the punishment phase, including a co-worker, one of appellant's sons, and a young man who had been appellant's mentee in an internship. These witnesses testified to appellant's professionalism at work and her skills as the working parent of seven children.

The jury assessed punishment at nine years' confinement. The jury did not "recommend that the imposition of [appellant's] sentence be suspended and [s]he be placed on community supervision."

This appeal followed. In one issue, appellant contends her trial counsel provided ineffective assistance "by failing to object to testimony that bolstered the complainant's accusation by improper vouching, improper opinion testimony, and improper hearsay."

## Ineffective Assistance of Counsel

We evaluate the effectiveness of counsel under the standard enunciated in *Strickland v. Washington,* 466 U.S. 668 (1984). *See Hernandez v. State,* 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). To prevail on her ineffective assistance claim, appellant must show counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that the result of the proceedings would have been different absent counsel's errors. *Strickland,* 466 U.S. at 687–88, 694.

Our review of counsel's performance is highly deferential, and we presume counsel provided reasonable assistance. *Bone v. State,* 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). When the record is silent about the motivation of counsel's tactical decisions, the appellant will rarely overcome the strong presumption that counsel acted reasonably. *Mallett v. State,* 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). We generally assume a strategic motive if any can be imagined and find counsel's

performance deficient only if his conduct was so outrageous no competent attorney would have engaged in it. *Andrews v. State,* 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). In most cases, the record on direct appeal is insufficient to review ineffective assistance of counsel claims. *Thompson v. State,* 9 S.W.3d 808, 813–14 (Tex. Crim. App. 1999). When the record on appeal is silent regarding counsel's actions we may not speculate to find trial counsel ineffective. *See Bone*, 77 S.W.3d at 835.

Appellant contends her counsel provided ineffective assistance "by failing to object to testimony that bolstered the complainant's accusation by improper vouching, improper opinion testimony, and improper hearsay." She argues that the trial court would have sustained proper objections to this testimony. She also contends that counsel "pursued a strategy of blaming an alternate perpetrator in the face of compelling eyewitness testimony."

The record contains no explanation of counsel's motives or strategy in failing to make certain objections and by "blaming an alternate perpetrator." Although appellant filed a motion for new trial, she did not argue that her counsel was ineffective, and the record does not reflect a hearing or ruling on the motion.

Appellant argues, however, that her ineffective assistance claim may be raised on direct appeal because (1) no strategic motive can be imagined, (2) the imagined strategy was not objectively reasonable, or (3) counsel's deficient performance was outrageous. She cites *Andrews* in support of her argument that "trial counsel's failure to object to the improper opinions of multiple professionals and experts cannot be

characterized as within the design of any objectively reasonable trial strategy—real or imaginative." In *Andrews*, trial counsel failed to object to the prosecutor's misstatement of the law regarding sentencing during the prosecutor's closing argument. *See Andrews*, 159 S.W.3d at 103. The court concluded that "[u]nder the extremely unusual circumstances of this case, the record contains all the information that we need to make a decision," and there could be no reasonable strategy for not objecting to the prosecutor's misstatement of the law. *Id.* "Thus, counsel's reasons, if any, were unnecessary to resolve the ineffective assistance of counsel claim." *Goodspeed v. State*, 187 S.W.3d 390, 394 (Tex. Crim. App. 2005) (Price, J., concurring) (discussing *Andrews*). The "extremely unusual" circumstances that were present in *Andrews* are not found here.

Appellant contends that witnesses Schoen, Ballew, and Barker were permitted to "vouch" for J.L.B.'s veracity. She argues that witnesses Schoen, Bigham, Ballew, and Dakil "share[d] hearsay accounts that bolstered J.L.B.'s accusation by showing her consistency." And she contends that counsel permitted Schoen, Bigham, Horn, Ballew, and Dakil to "share[ ] expert or pseudo-expert opinions on excessive force and child abuse." She argues that counsel's failure to object to this testimony constituted ineffective assistance.

We agree with appellant that the jury must be the "ultimate arbiters of credibility," *see Sandoval v. State*, 409 S.W.3d 259, 291 (Tex. App.—Austin 2013, no pet.), and that the "ultimate issue of criminal responsibility is beyond the province

of expert witnesses" and must be decided only by the jury. *Graham v. State*, 566 S.W.2d 941, 949 (Tex. Crim. App. 1978). But we disagree with appellant's contention that because of counsel's failure to object to certain testimony, the jury was not the ultimate arbiter here.

We have recognized on numerous occasions that experts may rely on their training and experience in interviewing children to determine whether a child's outcry exhibits signs of exaggeration, manipulation, or other "red flags." Both the Court of Criminal Appeals and this Court have concluded that this type of testimony is admissible and not a direct comment on a complainant's truthfulness. *See, e.g., Schutz v. State*, 957 S.W.2d 52, 73 (Tex. Crim. App. 1997); *White v. State*, No. 05-21-00901-CR, 2022 WL 2763357, at *3 (Tex. App.—Dallas July 15, 2022, no pet.) (mem. op., not designated for publication); *Granados v. State*, No. 05-17-01301-CR, 2019 WL 1349510, at *1 (Tex. App.—Dallas Mar. 26, 2019, no pet.) (mem. op., not designated for publication) (collecting cases). The testimony of Ballew and Barker that appellant cites as "vouching" for J.L.B.'s honesty—such as Barker's testimony about a child's ability to describe sensory details—falls into this category. *See White*, 2022 WL 2763357, at *2–3 (expert's testimony about forensic interviewers' training to look for "red flags" during the interview such as

lack of sensory details, inconsistencies, and evidence of coaching was admissible and not a direct comment on complainant's truthfulness).[3]

Appellant next contends that "counsel allowed witnesses to share hearsay accounts that bolstered J.L.B.'s accusation by showing her consistency." The testimony appellant cites, however, is evidence offered to show why the witnesses acted as they did, not evidence offered for its truth. For example, Bigham and Ballew testified that they arrived at J.L.B.'s school after receiving a report that a child had been beaten or abused. Schoen testified that she instructed the bus company to bring J.L.B. back to school after she was told J.L.B. did not want to get off the school bus and did not want to go home. A hearsay objection to this testimony would not have been sustained. *See Scott v. State*, 222 S.W.3d 820, 831–32 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (testimony offered to show circumstances under which witness called the police was not hearsay); TEX. R. EVID. 801(d)(2) (hearsay is "a statement . . . a party offers in evidence to prove the truth of the matter asserted in the statement"). Further, Dakil, an expert, could testify about the information she relied on in reaching her opinion that J.L.B.'s injuries were consistent with abuse. *See, e.g., Fox v. State*, 175 S.W.3d 475, 482 (Tex. App.—Texarkana 2005, pet. ref'd)

---

[3] Appellant also complains about a final, single question to Schoen on redirect. Schoen answered "Correct" to the question whether J.L.B. "didn't appear to be mistaken that it was the defendant that whooped her with an extension cord?" During the immediately-preceding cross-examination, appellant's counsel elicited testimony from Schoen that J.L.B. "has made mistakes." The questions were based on incidents at school appellant mentioned in her interview with police to support her contention that J.L.B. was not truthful. Counsel's decision to move on to the next witness and not bring attention to this final salvo on redirect could have been a strategic decision not to prolong Schoen's time on the stand when he had already raised questions about her credulity and judgment.

(expert may not testify a witness is truthful but may testify a child exhibits symptoms consistent with abuse). Dakil could also base her opinions on inadmissible hearsay. *Allison v. State*, 666 S.W.3d 750, 763 (Tex. Crim. App. 2023) ("Texas Rule of Evidence 703 allows an expert to base his or her opinion on inadmissible hearsay. TEX. R. EVID. 703. This is because the testifying expert's opinion is not itself hearsay and the testifying expert is available for cross-examination.").[4]

Appellant next argues that counsel permitted witnesses to "share[ ] expert or pseudo-expert opinions on excessive force and child abuse." She contends the trial court would have sustained objections to testimony that J.L.B.'s injuries were excessive, were the result of physical abuse, and were beyond reasonable discipline. Even if we were to assume that the trial court would have sustained objections to this testimony, the issue for the jury was not the severity of J.L.B.'s injuries but whether appellant was the person who inflicted them, and if so, whether appellant did so intentionally or knowingly, recklessly, or by criminal negligence. It is possible that given the graphic photographs of J.L.B.'s injuries that were already in evidence, counsel decided it would be unwise to appear to be challenging testimony about the injuries' severity. Assuming this strategic motive, we may not conclude counsel's

---

[4] We also note that during Ballew's testimony, the jury watched the video of appellant's interview with police during which she stated that J.L.B. "just lies," and had told lies on a number of occasions. Because J.L.B.'s character for truthfulness was attacked, evidence of her truthful character was admissible. TEX. R. EVID. 608(a); *see also* TEX. R. EVID. 404(a)(3) (in a criminal case, with certain exceptions, a defendant may offer evidence of a victim's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it).

performance was deficient. *See Andrews*, 159 S.W.3d at 101 (reviewing court "assume[s] a strategic motive if any can be imagined"); *Bone*, 77 S.W.3d at 835 (reviewing court may not speculate to find counsel ineffective where record is silent on counsel's actions).

Appellant also contends that counsel's "strategy of blaming an alternate perpetrator" was not objectively reasonable because two eyewitnesses—J.L.B. and appellant's adult daughter Dixon—testified that appellant struck J.L.B. with an extension cord and caused her injuries. However, the record reflects that counsel cross-examined both Dixon and J.L.B. at some length, eliciting admissions from Dixon that she was angry at her mother for her own reasons and admissions from J.L.B. that she had told lies on other occasions. Further, the jury heard appellant's interview with police in which appellant unequivocally denied striking J.L.B. at all. Although Ballew attempted to give appellant the opportunity to explain mitigating circumstances—that perhaps appellant lost control after a long day and did not realize the severity of her actions—appellant continued to deny that she had disciplined J.L.B. in any way. Further, appellant chose to testify after being admonished by her counsel about the risks of doing so. In her testimony, appellant continued to deny that she caused J.L.B.'s injuries. Given appellant's adamant denials and without a record of counsel's reasoning, we cannot say counsel's strategy was objectively unreasonable. *See Andrews*, 159 S.W.3d at 102.

We conclude appellant has not "overcome the strong presumption that counsel's conduct was reasonable." *See Mallett*, 65 S.W.3d at 63. We decide appellant's sole issue against her.

## Conclusion

Appellant's conviction is affirmed.

220345f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)

/Maricela Breedlove/

MARICELA BREEDLOVE
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DEMEATRICE RENEE
SHEPPARD, Appellant

No. 05-22-00345-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 397th Judicial District Court, Grayson County, Texas
Trial Court Cause No. 071988.
Opinion delivered by Justice Breedlove. Justices Nowell and Goldstein participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 30th day of June, 2023.